## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

J.G. Wentworth, S.S.C. Limited Partnership,

                Plaintiff,

        v.

Settlement Funding LLC d/b/a
Peachtree Settlement Funding,

                Defendant.

Civil Action

No. 06-0597 (TON)

### Motion to Dismiss Pursuant to
### Fed. R. Civ. P. 12(b)(6)

Based on the applicable law as set forth in the Memorandum of Law that supports this Motion, the Amended Complaint of J.G. Wentworth S.S.C. Limited Partnership fails to state a claim upon which relief can be granted.  Accordingly, Defendant Settlement Funding, L.L.C. d/b/a Peachtree Settlement Funding hereby respectfully requests that the Amended Complaint of J.G. Wentworth S.S.C. Limited Partnership be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

May 1, 2006

                               _____
                               Peter F. Marvin
                               MARVIN & HENKIN
                               8327 Germantown Avenue
                               Philadelphia, Pa. 19118
                               (215) 248-5201 (phone)
                               215.248.5204 (facsimile)
                               Pmarvin@Marvinhenkin.com  (email)
                               Attorney I.D. 16095

                               Lynn R .Charytan
                               Samir C. Jain
                               WILMER CUTLER PICKERING HALE
                                    AND DORR LLP
                               1875 Pennsylvania Ave. NW
                               Washington, DC 20006

                               *Attorneys for Defendant*
                               *Settlement Funding LLC d/b/a*
                               *Peachtree Settlement Funding.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| J.G. Wentworth, S.S.C. Limited Partnership,<br><br>*Plaintiff*,<br><br>v.<br><br>Settlement Funding LLC d/b/a<br>Peachtree Settlement Funding,<br><br>*Defendant*. | Civil Action No. 06-0597 (TON) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

As explained in this Memorandum, the Amended Complaint of Plaintiff J.G. Wentworth ("Wentworth") fails to state a claim as a matter of law. As a result, the Motion of Defendant Peachtree Settlement Funding ("Peachtree") should be granted, and the Amended Complaint dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

Plaintiff alleges that Peachtree infringed certain Wentworth trademarks in connection with the placement of advertisements on the Internet and the inclusion of invisible "metatags" on several of Peachtree's webpages. Notably, Plaintiff does not allege that Peachtree's advertisements or webpages ever used Plaintiff's trademarks to identify Peachtree's products or services. Instead, the alleged trademark "uses" that form the basis of Plaintiff's claims are, as Plaintiff concedes, entirely invisible to consumers. The first alleged use is Peachtree's purchase of the Wentworth name as a "keyword" from Internet search engine companies such as Google. As the Amended Complaint itself explains, however, this means only that a user who types the term "J.G. Wentworth" into the Google search engine is presented with both the search results

(which include, among other listings, one or more links to Plaintiff's website) and — in a separate area of the screen labeled "Sponsored Links" — several advertisements, including one for Peachtree's services. The second "use" Plaintiff alleges is Peachtree's inclusion of the Wentworth name in a list of invisible "metatags" in the source code of several of Peachtree's webpages. But again, the Amended Complaint does not allege that these metatags are visible to consumers, but simply that they cause a link to Peachtree's website to appear among the search results of some Internet search engines when a user searches for "J.G. Wentworth."

These allegations fail to state a claim of trademark infringement as a matter of law. Under well-established case law, an infringement claim requires a threshold showing that the defendant "used" the mark to identify the source of goods or services. Plaintiff's claim here fails to allege any such use. By its own terms, the Amended Complaint simply claims that Peachtree used Wentworth's marks as a trigger for displaying *Peachtree's* own marks in connection with advertising Peachtree's services. Such actions are no more an infringing use of a trademark than a manufacturer's contract with a store owner to place its generic drug on the shelf next to the corresponding name-brand drug. Such a "use" is not actionable under the trademark laws because it does not in any way use the protected mark to identify to a prospective purchaser the source of the goods or services. As the case law makes clear, that is equally true on the Internet as it is in the offline world.

At bottom, Peachtree's participation in Internet search engine advertising programs and inclusion of metatags simply has the effect of providing Internet users with more information and choices: Peachtree's "use" of the Wentworth marks to trigger a link to its own website provides consumers the option of investigating the competitive alternative that Peachtree offers. The

trademark laws do not protect trademark holders from such competition.  Accordingly, Plaintiff's

claims fail as a matter of law, and the Court should grant Peachtree's motion to dismiss.

## STATEMENT OF FACTS

Because Peachtree moves to dismiss the Amended Complaint pursuant to Fed. R. Civ. P.

12(b)(6), it treats the allegations in the Amended Complaint as true for the limited purposes of

the Motion and this memorandum.[1]

J.G. Wentworth describes itself as the "undisputed leader in the structured settlement

industry," an industry that "specializ[es] in turning future payments from structured settlements,

annuities, real estate notes and other assets into immediate cash" in return for the right to collect

customers' future payments.  (Am. Compl. ¶¶ 9-10.)  Defendant Peachtree is Plaintiff's "next

nearest competitor in the advance funding of structured settlements."  (*Id.* ¶ 15.)  Both

Wentworth and Peachtree operate Internet websites that promote their businesses and allow

customers to, among other things, request a price quote:  Wentworth has websites located at

www.jgwentworth.com and www.jgwfunding.com, while Peachtree has websites at

www.settlementfunders.com, www.peachtreesettlementfunding.com, and

www.settlementfunding.com.[2]  (*Id.* ¶¶ 14-15.)

According to the Amended Complaint, Google "operates an Internet search engine,

which allows Internet users to locate websites" by entering "search terms."  (Am. Compl. ¶ 25.)

---

[1]    *See U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) ("When
considering a Rule 12(b)(6) motion, courts accept as true the allegations in the complaint and its
attachments, as well as reasonable inferences construed in the light most favorable to the
plaintiffs.").

[2]    According to the Amended Complaint, "[t]he World Wide Web or 'web' is a portion of
the Internet which is designed to display information visually on 'websites' [composed of one or
more webpages].  A website is located and identified by its 'domain name,' which is the name of
the website followed by a designator such as .com, .org, .biz, etc."  (Am. Compl. ¶ 18.)

The search engine processes the search terms a user has entered and produces a "search-results page" listing websites ordered by "relevance" to the search terms. (*Id.* ¶ 21.) Each website listing includes its title, a snippet of text from the webpage containing the search terms in bold, and the address of the webpage. (*See, e.g.*, *id.*, Exhibit 2.) Google also sells advertising space on its search-results pages as a means of earning revenue from its service. (*Id.* ¶ 26.) Other Internet search websites either rely on a business relationship with Google—adopting both the Google search results and the corresponding advertisements—or operate their own search engines with their own similar advertising programs. (*Id.* ¶¶ 32-33.)

Because Internet users search based on specific terms, Google and the other search engines are able to target the ads they sell to third parties at "consumers who have already identified themselves as interested in" information about a specific topic. (Am. Compl. ¶ 26.) Google, for example, offers an advertising program called "AdWords," through which advertisers can "purchase or bid" on a particular "keyword" so that their ads appear in a designated area of the search-results page when a user enters that keyword as a search term in the Google search engine. (*Id.* ¶ 27.) Advertisements purchased through the AdWords program appear under the explicit heading "Sponsored Links" in one of two places: a box located above the user's search results, and in the margin to the right of the search results. (*Id.*; *see also id.*, Exhibit 2.) The Amended Complaint nonetheless alleges that "the 'Sponsored Link' display is inconspicuous, confusing, and ambiguous in that it is not apparent who 'sponsors' these links . . . ." (*Id.* ¶ 27.) The position of particular advertisements within the Sponsored Links area is the product of various factors such as the price paid and the rate at which users click on the advertiser's link, and no advertiser can "lock in" a particular position for its advertisement.

(*Id.* ¶ 28.) The Amended Complaint alleges that "[w]henever an Internet user clicks on a Sponsored Link, the corresponding advertiser must pay Google." (*Id.* ¶ 27.)

According to the Amended Complaint, Peachtree participates in the Google AdWords program and the similar programs of other Internet search companies. In particular, the Amended Complaint alleges that Peachtree purchased the right to have advertisements for its business appear in the "Sponsored Links" area of the Google search-results page when a user enters "J.G. Wentworth" or "JG Wentworth" as a search term. (Am. Compl. ¶¶ 30-31.) The Amended Complaint further alleges that Peachtree's "current" Google advertisement consists of the text "Peachtree Official Site – Specialists in Annuity & Settlement Funding. Request a Quote Online!," followed by a link to the Peachtree website at www.settlementfunders.com. (*Id.* ¶ 16.) Peachtree's Google advertisement allegedly has appeared beneath the "Sponsored Links" label in "one of the topmost" positions of the advertisements on the right margin of Google's search-results page. (*Id.* ¶ 31.) Advertisements on other search engines are either identical or substantially so. (*Id.* ¶¶ 32-33, Exhibits 3-4.) According to the Amended Complaint, Peachtree's advertisements have "divert[ed] customers" who originally intended to visit Plaintiff's website to Peachtree's website instead. (*Id.* ¶¶ 34-35.)

The Amended Complaint does *not* allege that the current text of Peachtree's advertisement references Wentworth, includes any of Plaintiff's trademarks, or uses any similar marks. Nor could it, as is plain from the text of the advertisement referenced in the Amended Complaint. ("Peachtree Official Site – Specialists in Annuity & Settlement Funding. Request a Quote Online!; www.settlementfunders.com." (Am. Compl. ¶ 16.)). To the contrary, the

5

advertisement mentions Peachtree explicitly — and exclusively.[3/]  (*Id.* ¶ 16.)  The Amended

Complaint also does not allege that the www.settlementfunders.com Peachtree Internet website

(to which the advertisement links) mentions or displays any of Plaintiff's trademarks.

In its Amended Complaint, Plaintiff has added the claim that Peachtree placed

"metatags," including Plaintiff's trademarks, in the source code of two of Peachtree's websites.[4/]

These metatags are "invisible to the Internet user." (Am. Compl ¶ 20.)  Their inclusion allegedly

causes some Internet search engines to include "a link to Peachtree's websites" among the other

search results when an Internet user searches for "J.G. Wentworth." (*Id.* ¶¶ 20, 24.)

Plaintiff alleges that Peachtree's participation in Internet advertising programs and its use

of metatags infringed the federal Lanham Act and Pennsylvania law.  In particular, Plaintiff

asserts claims for trademark infringement, false representation, and dilution of its "famous"

marks under the Lanham Act, as well as pendent claims for injury to business reputation and

trademark infringement under Pennsylvania law.  (Am. Compl. ¶¶ 45-83.)

---

[3/]     In the Amended Complaint, Plaintiff now vaguely alleges that, at some point in the past, Peachtree "has used other advertisements as well in its infringing participation in the AdWords program, including ads that specifically mention J.G. Wentworth." (Am. Compl. ¶ 16.) However, Plaintiff does not specify the text of any such ads or claim that the alleged mention of the name J.G. Wentworth in such putative ads served in any way to identify Peachtree's goods or services or otherwise caused consumer confusion.  Indeed, as the Google Advertising policy referenced in the Amended Complaint makes clear, if Plaintiff had believed that Peachtree's alleged mention of Wentworth marks in an advertisement was infringing, it could simply have asked Google to discontinue Peachtree's advertisement. *See* Google AdWords Trademark Complaint Procedure, http://www.google.com/tm_complaint_adwords.html (if advertisements "are using terms corresponding to the trademarked term in the advertisement's content," Google "will require the advertiser to remove the trademarked term from the content of the ad and prevent the advertiser from using the trademarked term in ad content in the future").

[4/]     According to the Amended Complaint, metatags "are a part of the HTML source code which contains keywords that are used to describe the contents of a web page." (Am. Compl. ¶ 20.) Metatags "are invisible to the Internet user," but allegedly are used by some search engines "to help determine whether a particular website page is relevant to a search term that has been entered by a search engine user." (*Id.*)

As set forth below, based on the applicable law, these alleged facts do not demonstrate any infringement of the Plaintiff's trademarks under either the Lanham Act or state law.

## ARGUMENT

I.  **THE AMENDED COMPLAINT DOES NOT STATE A CLAIM FOR TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT BECAUSE IT DOES NOT ALLEGE THAT PEACHTREE USED PLAINTIFF'S TRADEMARKS TO IDENTIFY ITS OWN GOODS OR SERVICES.**

A.  **Peachtree's Purchase of Advertising Keywords Is Not an Actionable "Trademark Use" of Plaintiff's Marks.**

To state an actionable claim for trademark infringement under the Lanham Act, a plaintiff must demonstrate that the defendant made "use" of the plaintiff's mark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services" and that "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). As the Third Circuit has repeatedly held, a plaintiff must demonstrate that "the defendant's use" of the plaintiff's valid trademark "to identify goods or services causes a likelihood of confusion." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (citing *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000)).

Plaintiff fails to satisfy this test at the threshold. Even when viewed most favorably to Plaintiff, the Amended Complaint does not allege that Peachtree "used" the "J.G. Wentworth" marks "to identify goods or services."[5] But the law is clear: "There can be no liability under the Lanham Act absent the use of a trademark in a way that identifies the products and services being advertised by the defendant." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d

---

[5]    As both Peachtree and Wentworth are specialty factoring companies, and act only as buyers of future cash flows from the public, they do not technically provide "goods" or "services." Nevertheless, this memorandum uses these terms for the sake of simplicity.

734, 757 (E.D. Mich. 2003). *See also 1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400,

412 (2d Cir.), *cert. denied*, 126 S. Ct. 749 (2005) ("'[U]se' must be decided as a threshold matter

because . . . no . . . activity is actionable under the Lanham Act absent the 'use' of a

trademark."); *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 (8th Cir. 2003) (finding that

each provision of the Lanham Act "requires, as a prerequisite to finding liability, that the

defendant 'use . . .' the protected mark or a colorable imitation thereof"); *Holiday Inns, Inc. v.*

*800 Reservation, Inc.*, 86 F.3d 619, 626 (6th Cir 1996) (the defendant's "use of a protected mark

. . . is a *prerequisite* to the finding of a Lanham Act violation") (emphasis in original).

To be sure, "[i]n the ordinary trademark infringement case, . . . there is no question that

the defendant used the mark, [and so] the analysis proceeds directly to the issue of whether there

is a likelihood of confusion." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp.

949, 958 (C.D. Cal. 1997), *aff'd*, 194 F.3d 980 (9th Cir. 1999); *see also Interactive Products*

*Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003). Here, in contrast,

"there is a preliminary question about whether defendant[ is] using the challenged mark in a way

that identifies the source of [its] goods." *Interactive Products*, 326 F.3d at 695. As described

above, the Amended Complaint does not allege that either the advertisement that forms the basis

of Plaintiff's claims or the website to which the advertisement links display Wentworth's marks

at all, let alone use them to identify Peachtree's goods or services. To the contrary, the text of

the only Peachtree advertisement the Amended Complaint specifically references uses only the

name Peachtree— not *any* of Plaintiff's marks.[6] Because the Amended Complaint does not

---

[6]     As noted above, the Amended Complaint vaguely alleges that that the text of some
unspecified Peachtree advertisement in the past mentioned "J.G. Wentworth." (Am. Compl. ¶
15.) Notably, however, the Amended Complaint fails to allege that this supposed alleged
mention of Plaintiff's name—however and whenever it may have occurred—was used to identify
Peachtree's services or goods or that it was in any way infringing or otherwise improper. Mere

allege any use of Plaintiff's trademarks to identify Peachtree's goods or services, "trademark infringement and false designation of origin laws do not apply," and the claim fails as a matter of law. *See id.*

The Amended Complaint attempts to sidestep this failing by claiming generally that Peachtree "used" the Wentworth marks as "keywords" to trigger the display of its advertisement on the search-results pages of Internet search companies such as Google. (Am. Compl. ¶¶ 2, 29-30.) But, as the Amended Complaint itself makes clear, this alleged "use" of the Wentworth marks as keywords does not *identify* Peachtree's goods or services. It merely "ensure[s] that [Peachtree's] ad appears immediately alongside the link for J.G. Wentworth's website" in response to a search for J.G. Wentworth.[2] (Am. Compl. ¶ 35.) Such contextual placement is not "use" of a mark under the Lanham Act, but is instead akin to a manufacturer's contracting with a drugstore to place its generic acetaminophen next to Tylenol, or to a fast-food chain's instruction to its franchisees to open restaurants adjacent to the locations of its more famous competitor.

---

"mention" of a competitor's name does not state a claim for the simple reason that there are numerous contexts in which an advertiser may lawfully mention a competitor's trademark: for example, the courts have consistently held that the "mention" of a competitor's name or mark for comparative advertising and "nominative" use is not trademark infringement. *See, e.g., G.D. Searle & Co. v. Hudson Pharm. Corp.*, 715 F.2d 837, 842 (3d Cir. 1983) (holding that the inclusion of the legend "Equivalent to METAMUCIL®" on a competitor's product was not a prohibited use of the trademark under the Lanham Act); *Diversified Mktg., Inc. v. Estee Lauder, Inc.*, 705 F. Supp. 128, 130 (S.D.N.Y. 1988) (finding phrase "If You Like ESTEE LAUDER You'll Love BEAUTY USA" to be lawful comparative advertising); *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969) (car-repair shop may lawfully advertise the brands of cars it services). In any case, and perhaps for this very reason, neither the counts alleging violations of federal and state law nor the specific relief sought by the Amended Complaint reference the alleged mention of the Wentworth mark in a Peachtree ad. Instead, the advertising-related infringement claims rely solely on the purchase of keywords.

[2]       As noted above, the Peachtree advertisement appears within a portion of the search-results page designated for advertising, separate from the portion containing the search results themselves. In particular, the advertisement appears under the heading "Sponsored Links," either in a box at the top of the search-results page or along its right-hand margin. (Am. Compl. ¶ 27 & Exhibit 2.)

As the courts have made clear, such practices are a permitted, "'non-trademark' way" of "using" another's mark—"that is, in a way that does not identify the source of a product." *Interactive Products,* 326 F.3d at 695. As the Second Circuit explained,

> it is routine for vendors to seek specific 'product placement' in retail stores precisely to capitalize on their competitors' name recognition. For example, a drug store typically places its own store-brand generic products next to the trademarked products they emulate in order to induce a customer who has specifically sought out the trademarked product to consider the store's less-expensive alternative.

*1-800 Contacts,* 414 F.3d at 411. *See also Playboy Enters., Inc. v. Netscape Commc'ns Corp.,* 354 F.3d 1020, 1035 (9th Cir. 2004) (Berzon, J., concurring) (noting that Internet advertisement that provides a user with the choice of visiting the advertiser's website instead of the plaintiff's is no different from Macy's stocking its own brand of clothing next to Calvin Klein's, which is "[c]ertainly not" an infringement of Calvin Klein mark).[8]

In each of these situations, the alleged infringer "uses" another company's mark, but not to identify his goods or services. The mark is never displayed or "place[d] . . . on any goods or services in order to pass them off as emanating from or authorized by" the mark owner. *1-800 Contacts,* 414 F.3d at 408. Instead, the alleged infringer in each situation "uses" the mark solely to guide its own marketing or the placement of its products or advertisements. But a company's "utilization of a trademark in a way that does not communicate it to the public . . . simply does not violate the Lanham Act, which is concerned with the use of trademarks in connection with the sale of goods or services in a manner likely to lead to consumer confusion as to the source of

---

[8]      The majority opinion in *Playboy* is inapposite: it did not address the "use" question because there was "[n]o dispute" on appeal that the "defendants used the marks in commerce." *Playboy,* 354 F.3d at 1024. Moreover, unlike the alleged facts here, the majority in *Playboy* expressly noted that it was "not addressing a situation in which a[n] advertisement clearly identifies its source with its sponsor's name." *Id.* at 1030. *See also id.* at 1025 n.16 (noting that "if a banner advertisement clearly identified its source . . . no confusion would occur").

such goods or services." *Id.* at 409. "Use" under the Lanham Act requires that the accused infringer "caus[es] the public to see the protected mark and associate the infringer's goods or services with those of the mark holder." *DaimlerChrysler*, 315 F.3d at 939 (holding that a defendant's registration of the 1-800-MERCEDES "vanity" telephone number was not a "use" of the plaintiff's mark under the Lanham Act).

For this reason, several courts, including the Second Circuit, have explicitly rejected Lanham Act claims in the context of Internet advertising in cases virtually identical to this one: where a plaintiff complains about a competitor's "use" of the plaintiff's trademark to "trigger" display of the competitor's online ads. In particular, the United States District Court for the Southern District of New York less than six weeks ago rejected a claim indistinguishable from Plaintiff's claim here. In that case, the plaintiff argued that the defendant's purchase of the plaintiff's mark "Zocor" as a keyword to trigger advertisements on Google and Yahoo! search engines constituted infringement. As that court explained in language equally applicable here:

> Here, in the search engine context, defendants do not "place" the ZOCOR marks on any goods or containers or displays or associated documents, nor do they use them in any way to indicate source or sponsorship. Rather, the ZOCOR mark is "used" only in the sense that a computer user's search of the keyword "Zocor" will trigger the display of sponsored links to defendants' websites. *This internal use of the mark "Zocor" as a key word to trigger the display of sponsored links is not use of the mark in a trademark sense.*

*Merck & Co. v. Mediplan Health Consulting, Inc.*, Nos. 05 Civ. 3650 et al., 2006 WL 800756, at *9 (S.D.N.Y. Mar. 30, 2006) (emphasis added).

The *Merck* case is fully in line with three other similar and highly relevant cases, each of which involve the Internet advertising company WhenU.com, Inc. ("WhenU"). WhenU distributes a software program that causes an Internet user's screen to display "pop-up" advertising keyed to the content of the websites the user visits. *1-800 Contacts*, 414 F.3d at 404-

05. *See also Wells Fargo*, 293 F. Supp. 2d at 738-39; *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279

F. Supp. 2d 723, 725-26 (E.D. Va. 2003). Thus, for example, WhenU might automatically

present a pop-up advertisement for Pepsi to a user viewing Coca-Cola, Inc.'s website. The

plaintiff in each of the *WhenU* cases alleged trademark infringement, complaining that WhenU's

use of a web address containing the plaintiff's mark as a trigger for the display of the competing

advertisements and "the fact that WhenU's pop-up ads appear on the same screen as [the

plaintiff's] website and logo" were enough to constitute actionable "use" under the Lanham Act.

*U-Haul*, 279 F. Supp. 2d at 727. *See also 1-800 Contacts*, 414 F.3d at 408-10; *Wells Fargo*, 293

F. Supp. 2d at 758.

     In each case, however, the court rejected the plaintiff's argument. The courts found that

WhenU's "use" of the plaintiff's marks was limited to a "pure machine-linking function"—not a

use in connection with the identification of the defendant's goods and services. In *U-Haul*, for

example, the court explained that "WhenU's incorporation of U-Haul's URL and 'U- Haul' in

the [software] program is not a trademark use because WhenU merely uses the marks for the

'pure machine-linking function' and in no way advertises or promotes U-Haul's web address or

any other U-Haul trademark." *U-Haul*, 279 F. Supp. 2d at 728. As the Second Circuit then held,

"as a matter of law," such non-identifying use—both inclusion of the plaintiff's marks in

WhenU's database as triggers for the display of advertisements and WhenU's presentation of

advertisements immediately adjacent to the display of the plaintiff's branded website—is not

"'use' [of the plaintiff's] trademarks within the meaning of the Lanham Act." *1-800 Contacts*,

414 F.3d at 403. *See also id.* at 410 (explaining that "[t]he fatal flaw" in plaintiff's claim was

that the "ads do not display the 1-800 trademark"). This is because "WhenU does not use any of

the plaintiffs' trademarks to indicate anything about the source of the products and services it

advertises." *Wells Fargo*, 293 F. Supp. 2d at 762. *See also id.* at 759 (noting that the "typical

consumer does not have access" to the directory containing plaintiffs' marks that WhenU uses

"to determine what advertisements to direct to consumers"); *U-Haul*, 279 F. Supp. 2d at 728

("U-Haul fails to adduce any evidence that WhenU uses U-Haul's trademarks to identify the

source of its goods or services.").[9]

The *Merck* and *WhenU.com* holdings are decisive and should guide the Court here.[10]

Just as in those cases, the Amended Complaint alleges nothing more than that Peachtree used the

---

[9]     *See also Interactive Products*, 326 F.3d at 696-97 (holding that placement of a variant of
plaintiff's mark in the "post-domain path" of the Internet address of defendant's website did not
constitute "use" for purposes of the Lanham Act because it did not signify the "source" of goods
or services). Courts similarly have rejected claims of infringement against those whose only
"use" of the plaintiffs' trademark was the registration of an Internet domain name containing the
mark. In such cases, "there is no trademark use and there can be no infringement." *Lockheed
Martin Corp.*, 985 F. Supp. at 958. *See also Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 307
(D.N.J.), *aff'd* 159 F.3d 1351 (3d Cir. 1998) (finding that "the mere registration of a domain
name, without more, is not a 'commercial use' of a trademark"); *Bird v. Parsons*, 289 F.3d 865,
879 (6th Cir. 2002) (same). This principle extends even to situations in which "cybersquatters"
registered domains with the sole intention of extracting ransom from the owner of the mark.
Because trademark owners could not bring infringement or dilution claims in such situations,
Congress passed the Anti-Cybersquatting Consumer Protection Act of 1999, P.L. 106-113, 113
Stat. 1536 (codified at 15 U.S.C. §1125(d)). J. Thomas McCarthy, *McCarthy on Trademarks
and Unfair Competition* § 23:11.1 (4th ed. 2005).

[10]     While a few courts have reached seemingly contrary decisions, these are not on point: in
two, the facts are distinguishable and a key underlying legal basis for the decision has been
reversed; the third is a conclusory determination that lacks analysis. In *GEICO v. Google, Inc.*,
330 F. Supp. 2d 700 (E.D. Va. 2004), for example, although the court denied a motion to dismiss
infringement claims against Google based on the sale of the plaintiff's marks as advertising
keywords, it relied heavily on the district court's decision in *1-800 Contacts*, which was
subsequently reversed by the Second Circuit decision discussed above. *See GEICO*, 330 F.
Supp. 2d at 703. In any event, the claimed "uses" in *GEICO* are inapposite here: the plaintiff
alleged that Google's sale of the plaintiff's mark as a keyword falsely implied a licensing or
other business relationship between Google and the plaintiff and that the advertisers that
purchased the keywords then used the plaintiff's trademark in the text of some of their ads in a
manner "likely to deceive customers." *See id.* at 704. Here, by contrast, Peachtree was not
selling the keywords and so there is no implied business relationship between Plaintiff and
Peachtree; further, Plaintiff does not claim that the prior ad in which Peachtree allegedly
mentioned Plaintiff's mark was in any way deceptive. The unpublished decision in *Google Inc.
v. Am. Blind & Wallpaper Factory, Inc.*, No. C-03-05340JF, 2005 U.S. Dist. LEXIS 6228 (N.D.

Wentworth trademarks for a non-identifying "machine-linking" function, triggering display of

Peachtree's advertisement on relevant Internet search-results pages.  It does not allege that this

"use" of the marks was displayed or ever visible to any user, let alone that the marks were used

in any way to identify Peachtree's own goods or services.  Peachtree's alleged "use" of

Plaintiff's marks to trigger advertisements, but not to identify the source of its goods, does not

constitute "use" that implicates the trademark laws.  Without the requisite trademark use, the

claim fails.

Further, while the court need not reach this issue,[11] viewing Peachtree's alleged "use"

of the marks through the lens of consumer confusion provides an alternate path to the conclusion

that the complaint must be dismissed as a matter of law.  The Third Circuit requires that

"defendant's use of the mark to identify goods or services *cause*[] a likelihood of confusion."[12]

*A&H Sportswear*, 237 F.3d at 210 (emphasis added).  *See also Holiday Inns*, 86 F.3d at 626

("Holiday Inns does not offer, and our own research has not produced, a case in which the

---

Cal. Mar. 30, 2005), is similarly distinguishable.  Finally, while the court in *Edina Realty, Inc. v. TheMLSonline.com*, No. Civ. 04-4371, 2006 WL 737064 (D. Minn. Mar. 20, 2006), found that the purchase of a mark as a keyword was a "use in commerce," it did *not* analyze whether that use identified the source of goods and services.  *See id.* at *3.

[11]    *See 1-800 Contacts*, 414 F.3d at 406 ("Because we agree with WhenU that it does not 'use' 1-800's trademarks, we need not and do not address the issue of likelihood of confusion."); *Wells Fargo*, 293 F. Supp. 2d at 764 ("[T]he Court's holding that defendant has not impermissibly used plaintiffs' marks makes it unnecessary to reach the issue of likelihood of confusion.").

[12]    The general rule that consumer confusion is a factual question "does not preclude the district court from determining likelihood of confusion as a matter of law, either through dismissal [via a Rule 12(b)(6) motion] or summary judgment."  *Murray v. CNBC*, 86 F.3d 858, 860-861 (9th Cir. 1996).  In fact, a court must grant a motion to dismiss if "no reasonable factfinder could find a likelihood of confusion on any set of facts that Plaintiffs could prove." *Qwest Commc'ns. Int'l v. Cyber-Quest, Inc.*, 124 F. Supp. 2d 297, 304 (M.D. Pa. 2000).  *See also World Wrestling Fed'n Entm't, Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 424 (W.D. Pa. 2003) (concluding that "the Court can conclude that no likelihood of confusion exists as a matter of law") (internal quotation omitted); McCarthy, *supra*, § 23:67.

defendant neither *used* the offending mark nor *created* the confusion and yet was deemed to have committed a trademark infringement.") (emphasis in original). But it should go without saying that "use" of a trademark in a way that is not visible to consumers cannot *cause* confusion on the part of those consumers.[13/]

Finally, dismissal of Plaintiff's claims is fully consistent with the policies underlying trademark law. Trademark law is designed in part to reduce consumers' search costs, making it easier for them to find the products and services for which they are looking without having to investigate the source of those goods and services. *See, e.g., Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) (stating that federal trademark law "reduces the customer's costs of shopping and making purchasing decisions"). Thus, the courts have made clear that the purpose of trademark law is to protect a mark's "source identification" function and that parties may "use" another person's marks in ways that do not implicate that function.[14/] *See Wells Fargo*, 293 F. Supp. 2d at 761. Contrary to Plaintiff's claims here, Congress did not intend the Lanham Act to create a free-floating right in the "goodwill" that may be associated with a mark:

> [T]he only legally relevant function of a trademark is to impart information as to the source or sponsorship of the product. [Trademark owners] argue that

---

[13/]    *See generally* Stacey L. Dogan & Mark A. Lemley, *Trademarks and Consumer Search Costs on the Internet*, 41 Hous. L. Rev. 777, 820 (2004) ("[T]he fact that an advertiser uses a keyword to reach a consumer with accurate information that is of interest to that consumer cannot itself be 'confusion' . . . . It may be a diversion of consumer attention, but if the consumer is not confused, that diversion is simply not illegal.").

[14/]    Thus, for instance, the Lanham Act does not apply to a car-repair shop's use of the "VW" mark to indicate the types of cars it services, *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969), to a television station's use of the trademark "Boston Marathon" to advertise its coverage of the unaffiliated event, *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42 (1st Cir. 1991), or to a newspaper's for-profit telephone poll asking readers to name their favorite member of a popular band, *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992). In each of these cases, while the defendant may have profited in part from the notoriety of the plaintiff's mark, its use never implicated the "source-identification function that is the purpose of trademark." *Id.* at 308.

protection should also be extended to the trademark's commercially more important function of embodying consumer good will created through extensive, skillful, and costly advertising. The courts, however, have generally confined legal protection to the trademark's source identification function for reasons grounded in the public policy favoring a free, competitive economy.

*Smith v. Chanel, Inc.*, 402 F.2d 562, 566 (9th Cir. 1968) (internal footnotes omitted).

In this case, Peachtree's alleged actions do not increase consumer search costs or incorrectly suggest the origin of its services. To the contrary, Peachtree's contextual advertising truthfully identifies a competing product. Its advertisement may attract customers who originally sought Plaintiff's website, but only by providing an alternative, accurately labeled choice. And that is no more unlawful than the placement of competing products close to a well-known brand on store shelves in the hope that consumers originally intending to buy the brand-name goods will buy the competitive goods instead. Banning the use of trademarked words as "keywords" for targeting of advertising—what the logic of Plaintiff's trademark claim would require—would serve not to reduce the costs consumers incur to locate products, but rather to inhibit the ability of consumers to discover and take advantage of competitive options. "The presentation of viable alternatives or the truthful description of a competitor's capabilities do not distort the market; to the contrary, this information contributes to a robust and fully informed market." Dogan & Lemley, *supra*, at 820.

**B.   Peachtree's Use of "Invisible" Metatags Similarly Fails to State an Actionable Claim for Trademark Infringement.**

For precisely the reasons just discussed, Peachtree's alleged inclusion of the Wentworth marks in "invisible" metatags similarly cannot constitute unlawful trademark "use" of those marks. As the Amended Complaint itself concedes, in using the Wentworth name in some of its webpages' metatags, Peachtree did not display Wentworth's name or marks to consumers. To the contrary, the Amended Complaint specifically notes that metatags "are invisible to the

16

Internet user." (Am. Compl. ¶ 20.) Thus, Peachtree does not use the Wentworth name in its metatags to identify its goods or services to consumers. Indeed, the Peachtree search result listing and link to its website that are allegedly triggered by the relevant metatags are clearly identified as Peachtree's, and do not display the Wentworth name or marks. (*See* Am. Compl. Exhibit 4 (showing Peachtree search result listing with text "Welcome to Peachtree Settlement Funding").) Thus, as with Peachtree's "use" of keywords, the alleged "use" of the Wentworth name in Peachtree's metatags is a purely "internal use of the mark" designed "to trigger the display of" a link to Peachtree's website. *Merck*, 2006 WL 800756, at *9. As explained above, this "'pure machine-linking function'" is not a "trademark use." *U-Haul*, 279 F. Supp. 2d at 728.

To be sure, some cases have found Lanham Act liability in connection with a defendant's use of metatags. *See, e.g.*, *Eli Lilly & Co. v Natural Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000); *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F3d 1036, 1064-65 (9th Cir. 1999); *New York State Soc'y of CPA's v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d. 331, 342 (S.D.N.Y. 1999). But none of these cases even considered the critical question that the *Merck* and *WhenU* courts have identified: whether a "use" that is invisible to consumers and thus does not (and cannot) identify the source of the defendant's goods or services can constitute actionable trademark use. Instead, these cases give the "use" issue short shrift, and proceed to focus on the question of consumer confusion.

Moreover, no court to consider the trademark significance of metatags has considered the impact of the *WhenU* line of cases. On the other hand, both courts and scholars *have* questioned whether the metatags liability cases make any sense—especially in light of the analysis of "trademark use" in the *WhenU* and other cases. For example, the Court of Appeals for the Second Circuit, in *1-800 Contacts*, 414 F. 3d at 411 n.15, specifically noted that it was not

17

prepared to "endorse [the metatags cases'] holdings." In her concurrence in *Playboy v.*
*Netscape*, 354 F.3d at 6, Judge Berzon also criticized the metatags cases as creating an
"insupportable rule" that would impose liability for the use of trademarks in metatags even when
the result of such use is the "accurate list[ing]" of the defendant's website "in the applicable
search results." Similarly, academics have explained that the metatags cases threaten a "drastic
broadening of liability for trademark infringement on the Internet—via the obliteration of the
trademark use requirement—for conduct that may not actually result in high levels of consumer
confusion, and that simply does not seem to be trademark infringement in the sense lawyers and
judges have been understanding this body of law." Uli Widmaier, *Use, Liability, and the*
*Structure of Trademark Law*, 33 Hofstra L. Rev. 603, 645 (2004).[15]

Indeed, it is not even clear that the courts in the metatags cases themselves were prepared
to find that the inclusion of trademarks in website metatags, standing alone, constitutes
trademark infringement for purposes of the Lanham Act. For example, after reviewing several of
the leading metatags cases, the *Wells Fargo* court noted that, in each case, "the defendant's use
of the plaintiff's mark was *not limited* to use as a metatag on the defendant's website." *Wells*
*Fargo*, 293 F. Supp. 2d at 762 n.19 (emphasis added). As the court noted:

> For example, in *New York State Society of Certified Public Accountants*, the
> defendant also used plaintiff's Internet domain name NYSSCPA to establish his
> Website at NYSSCPA.com (".org" was the top-level domain of plaintiff's site).
> *New York State Society of Certified Public Accts., 79 F. Supp. 2d at 338-39.* In
> *Brookfield*, the defendant used plaintiff's mark as the domain name for its
> Website. *Brookfield, 174 F.3d at 1043-44.* And in *Eli Lilly*, the court focused on
> the defendant's use of the plaintiff's mark "Prozac" in the name of its herbal
> alternative "Herbrozac," in deciding that defendant infringed upon plaintiff's

---

[15]    *See also* David M. Klein & Daniel C. Glazer, *Reconsidering Initial Interest Confusion on*
*the Internet*, 93 Trademark Rep. 1035, 1061-62 (2003) ("Although metatags allow consumers to
consider listed websites in close proximity, there is no more representation made to the consumer
of affiliation or sponsorship than in the context of a telephone book's yellow pages."); Dogan &
Lemley, *supra*, at 816 (questioning *Brookfield* and other metatags liability decisions).

mark, rather than defendant's inclusion of the mark as metatags on its website.
*Eli Lilly, 233 F.3d at 462-64.*

*Wells Fargo*, 293 F. Supp. 2d at 762 n.19.  And of course, there are no allegations in this case that any of these additional "uses" occurred.

Rather than constituting illicit trademark use, use of metatags serves the same procompetitive purpose as does keyword advertising:  it "reduces the customer's costs of shopping and making purchasing decisions" by increasing the number of different options returned in a search result.  Indeed, when Peachtree's use of metatags causes its listing to appear in a search result, that use of metatags does not *displace* the listings of J.G. Wentworth's sites in Internet search results; instead, Wentworth's sites appear first in those listings, and Peachtree's site is added below as an additional search result.  (*See, e.g.*, Am. Compl. Exhibits 3-4.) Plaintiff may prefer that potential customers *not* learn of competitive options, but trademark law is not a means of preventing that result.  As Professors Dogan and Lemley wrote in criticizing the *Brookfield* metatag liability case, "the Brookfield decision undermines the proconsumer, pro-information goals of trademark law by allowing trademark holders to impede competitors' efforts to draw attention to their comparable products.  It is ironic that the court did so in the name of promoting precisely those goals."  Dogan & Lemley, *supra*, at 816.

## II.   PLAINTIFF'S REMAINING CLAIMS ALSO REQUIRE A TRADEMARK "USE" AND THEREFORE ALSO FAIL AS A MATTER OF LAW.

Plaintiff's remaining claims for false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Am. Compl. ¶¶ 57-59), dilution under section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (Am. Compl. ¶¶ 61-67), and Pennsylvania common law trademark infringement and dilution (Am. Compl. ¶¶ 71-79) fail for the same reason:  they all share with Plaintiff's federal trademark infringement claim the same threshold requirement of

trademark "use." *See Scott Fetzer Co. v. Gehring*, 288 F. Supp. 2d 696, 703 (E.D. Pa. 2003)

("The elements for [federal trademark infringement, federal unfair competition, and

Pennsylvania common law unfair competition] are identical except that the federal claims require

an effect on interstate commerce."). As explained above, the Amended Complaint fails to allege

such use.

Both of Plaintiff's other federal claims clearly require "trademark use." As this Court has

explained, "[f]ederal trademark infringement . . . and a false designation of origin claim, known

more broadly as federal unfair competition, . . . are measured by identical standards." *Louis*

*Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 580 (E.D. Pa. 2002). A federal

dilution claim under 43(c) of the Lanham Act similarly requires that a defendant make

"trademark use" of the plaintiff's mark. *See U-Haul*, 279 F. Supp. 2d at 729 ("For the reasons

stated [in the trademark infringement analysis], U-Haul is unable to show that WhenU was using

U-Haul's marks as defined in the Lanham Act. Thus, WhenU is entitled to judgment as a matter

of law on U-Haul's claim of trademark dilution."); *Strick Corp. v. Strickland*, 162 F. Supp. 2d

372, 377-78 (E.D. Pa. 2001) (listing elements of dilution claim, including requirement that

"Defendant's use dilutes the mark's distinctive quality by lessening the capacity of Plaintiff's

mark to identify and distinguish goods or services").

Finally, Plaintiff's state law claims are governed by the same tests as their federal

counterparts and accordingly fail as a matter of law for the same reasons. *See, e.g., Gideons*

*Int'l, Inc. v. Gideon 300 Ministries, Inc.*, 94 F. Supp. 2d 566, 580 (E.D. Pa. 1999) ("The test for

[Pennsylvania] common law trademark infringement and unfair competition is essentially the

same as the test for infringement and unfair competition under the Lanham Act."); *Strick*, 162 F.

Supp. 2d at 378 n.10 ("As the federal and [Pennsylvania] state dilution statutes contain virtually identical provisions, they are subject to the same analysis.").

## CONCLUSION

For the foregoing reasons, the Court should grant Peachtree's motion and dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted.

Dated:  May 1, 2006

_____
Peter F. Marvin
MARVIN & HENKIN
8327 Germantown Avenue
Philadelphia, Pa. 19118
(215) 248-5201 (phone)
215.248.5204 (facsimile)
Pmarvin@Marvinhenkin.com (email)
Attorney I.D. 16095

Lynn R. Charytan
Samir C. Jain
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
(202) 663-6000 (phone)
(202) 663-6363 (facsimile)

*Attorneys for Defendant*
*Settlement Funding LLC d/b/a*
*Peachtree Settlement Funding.*

## Certificate of Service

It is hereby certified that on May 1, 2006 a copy of the foregoing Motion to Dismiss was filed electronically and is available for viewing and downloading from the ECF system. It is further certified that on this date the foregoing Motion to Dismiss was served by first class mail, postage prepaid on:

Richard M. Ochroch, Esq.
James J. Waldenberger, Esq.
318 So. 16th Str
Philadelphia, PA 19102

*Attorneys for Plaintiff*
*J.G. Wentworth, S.S.C.*
*Limited Partnership*

_____
Peter F. Marvin