# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

J.G. WENTWORTH S.S.C. LIMITED
PARTNERSHIP,

*Plaintiff*,

-against-                                          06-CV-00597-TON

SETTLEMENT FUNDING, LLC d/b/a
PEACHTREE SETTLEMENT FUNDING,

*Defendant.*

## MEMORANDUM OF J.G. WENTWORTH S.S.C. LIMITED PARTNERSHIP IN OPPOSITION TO MOTION TO DISMISS

ABELMAN, FRAYNE & SCHWAB
666 Third Avenue
New York, New York 10017
(212) 949-9022

OCHROCH & GRABER, P.C.
318 S. Sixteenth Street
Philadelphia, PA  19102
(215) 735-2707

Attorneys for Plaintiff J.G. Wentworth
S.S.C. Limited Partnership

May 18, 2006

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

PROCEDURAL HISTORY ............................................................................................. 4

ARGUMENT ................................................................................................................... 7

I.     THE AMENDED COMPLAINT STATES VALID CLAIMS FOR RELIEF, AND
SHOULD NOT BE DISMISSED. ................................................................................... 7

   A.     Peachtree's Motion to Dismiss Must Meet a High Procedural Standard ........................... 7

   B.     Peachtree's Use of J.G. Wentworth's Trademarks in
Keyword Advertising is Actionable .................................................................................. 8

   C.     Peachtree's Use of J.G. Wentworth's Trademarks
in the Meta Tags for Peachtree's Own Websites is Actionable ....................................... 12

   D.     The Case Law and Factual Arguments on Which Peachtree
Rely Are Distinguishable ................................................................................................ 16

     1.     The case law on which Peachtree relies is distinguishable ........................................ 16

     2.     Peachtree's factual arguments are distinguishable ..................................................... 19

   E.     Since Peachtree's Actions Constitute "Use" of J.G. Wentworth's
Trademarks, Peachtree's Motion to Dismiss J.G. Wentworth's
Remaining Claims Should Be Denied. ............................................................................ 21

CONCLUSION ............................................................................................................... 22

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

J.G. WENTWORTH S.S.C. LIMITED
PARTNERSHIP,

*Plaintiff*,

-against-                                                    06-CV-00597-TON

SETTLEMENT FUNDING, LLC d/b/a
PEACHTREE SETTLEMENT FUNDING,

*Defendant.*

### MEMORANDUM OF J.G. WENTWORTH S.S.C. LIMITED PARTNERSHIP IN OPPOSITION TO MOTION TO DISMISS

Plaintiff J.G. Wentworth S.S.C. Limited Partnership ("J.G. Wentworth") respectfully submits this Memorandum of J.G. Wentworth S.S.C. Limited Partnership in Opposition to Motion to Dismiss in response and opposition to the Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def. Mem.") filed by Defendant Settlement Funding LLC d/b/a Peachtree Settlement Funding ("Peachtree"). Since Peachtree has failed to carry its heavy burden of showing that J.G. Wentworth can prove no set of facts which would entitle it to relief from Peachtree's wrongful conduct, Peachtree's motion should be denied.

### INTRODUCTION

As explained in the Amended Complaint, defendant Peachtree – a direct competitor of plaintiff J.G. Wentworth – appropriates J.G. Wentworth's federally registered "J.G. Wentworth" trademarks wholesale by using them in the "meta tags" for Peachtree's own Internet websites and by bidding on them as keywords in the keyword advertising programs of numerous Internet search engine providers, including Google, the most popular Internet search engine provider. There is *only one reason* for Peachtree to do so, namely to seek to ensure that a

link to its Internet website appears as close as possible to a link to J.G. Wentworth's website when an Internet user searches for "J.G. Wentworth."  In other words, because of Peachtree's wrongful conduct, a search engine user searching for information about J.G. Wentworth will be confronted with search results showing a link to Peachtree's website in confusing, close juxtaposition to an advertisement for and link to J.G. Wentworth's website.

A significant number of Internet search engine users viewing these results are undoubtedly diverted, at least initially, to Peachtree's website.  Indeed, there is no other reason for Peachtree to engage in this conduct were that not the case.  Peachtree made the deliberate decision to encode J.G. Wentworth's marks in the meta tags for its own Internet websites, presumably directed its website designer to do so, and has apparently used J.G. Wentworth's marks in its website meta tags of several years.  Likewise, Peachtree made the decision to bid on J.G. Wentworth's trademarks through its participation in numerous Internet search engine keyword advertising programs, including Google's, and presumably pays significant funds to continue to do so.  Peachtree would not have taken these actions, or incurred the expense of doing so, if it did not believe that they would achieve a favorable result for Peachtree – at J.G. Wentworth's expense.

Peachtree seeks to excuse its freeriding on J.G. Wentworth's hard-earned goodwill by arguing that its misappropriation of J.G. Wentworth's trademarks does not constitute a trademark "use" of those marks under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*  But Peachtree's argument is factually and legally wrong.

As a matter of fact, Peachtree uses J.G. Wentworth's trademarks in at least three ways that are actionable under the Lanham Act:  (1) it encoded J.G. Wentworth's marks in the meta tags for its own Internet websites; (2) it paid and continues to pay to bid on them as

2

keywords in search engine Internet advertising programs; and (3) through these previous two uses, it manipulates the display of search engine results so that an ad for and link to its own website appears in close, confusing proximity to the link for J.G. Wentworth's website which displays J.G. Wentworth's own marks.

As a matter of law, Peachtree tries to misdirect the Court by relying on cases that do not address the specific issues in contention here – whether Peachtree's use of J.G. Wentworth's trademarks in the meta tags for its own websites and as keywords in Internet keyword advertising programs state claims under the Lanham Act. There is, though, abundant case law, cited below, upholding the propriety of J.G. Wentworth's claims here.

Peachtree asserts the "invisibility" of its conduct as a virtue, and suggests that since the public does not see its meta tags or its participation in the keyword advertising program, the public does not "see" its use of J.G. Wentworth's trademarks in commerce. But it is precisely the supposed invisibility of Peachtree's conduct that leads to its insidiousness. Through its computerized manipulation of the search engine display results, Peachtree ensures that its ad and a link to its website will be confusingly displayed near a link to J.G. Wentworth's website and near J.G. Wentworth's trademarks. The public may not know what Peachtree is doing with the meta tag coding or its keyword bidding, but the public most definitely sees the search results – which prominently show Peachtree, even though the user was searching for J.G. Wentworth.[1]

---

[1] Peachtree notes that the "Amended Complaint . . . does not allege that the www.settlementfunders.com Peachtree Internet website (to which [Peachtree's] advertisement links) mentions or displays any of Plaintiff's trademarks." (Def. Mem. at 6) That is correct. Why, then, does Peachtree use J.G. Wentworth's trademarks in its meta tags and as keywords?

In essence, Peachtree argues that even though it has appropriated J.G. Wentworth's federally registered trademarks for its own insatiate commercial gain, there is simply no set of facts under which J.G. Wentworth could prove its entitlement to the relief it seeks, so J.G. Wentworth must simply continue to suffer Peachtree's unfair competition. The applicable law, however, is not as crabbed as Peachtree suggests. J.G. Wentworth states valid claims for relief, and Peachtree's motion should be denied.

## PROCEDURAL HISTORY

This action was begun with the filing of the original Complaint on February 9, 2006. The original Complaint was addressed to Peachtree's infringing activity with regard to its participation in search engine keyword advertising programs. After further investigation disclosed Peachtree's infringing use of J.G. Wentworth's marks as meta tags for Peachtree's own websites, J.G. Wentworth filed the Amended Complaint on April 10, 2006. Peachtree, which had withdrawn it previous motion to dismiss upon the filing of the Amended Complaint, filed the current motion to dismiss under Fed. R. Civ. P. 12(b)(6) on May 1, 2006.

The Amended Complaint alleges nine separate causes of action: (a) for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1) (First and Second Causes of Action); (b) for false representation under the Lanham Act, 15 U.S.C. § 1125(a) (Third and Fourth Causes of Action); (c) for dilution under the Lanham Act, 15 U.S.C. § 1125(c) (Fifth and Sixth Causes of Action); (d) for injury to business reputation and dilution under Pennsylvania law (Seventh and Eighth Causes of Action); and (e) for common law trademark infringement and unfair competition (Ninth Cause of Action).

As alleged in the Amended Complaint, the action arises from Peachtree's trading on J.G. Wentworth's goodwill through Peachtree's efforts to promote its Internet websites by

diverting traffic from J.G. Wentworth's website in at least two ways.  First, Peachtree uses J.G. Wentworth's famous, federally registered trademarks in the meta tags for two of its Internet websites in order to improve Peachtree's position in the search results if J.G. Wentworth's trademarks are entered as the search terms in various Internet search engines.[2]  Second, Peachtree participates in the "AdWords" program offered by Google Inc. ("Google") in its provision of Internet search engine services.  Through its participation in the AdWords program, Peachtree purchases the right to have an advertisement and link to its Internet website displayed in immediate proximity to a link to J.G. Wentworth's website whenever a Google user searches the terms "J.G. Wentworth" and "JG Wentworth."  Peachtree also participates in similar keyword advertising programs offered by other Internet search engine services, because the displayed results for those search engine services also show an advertisement and link to Peachtree's Internet website.  (Amended Complaint ¶ 1)

Through its use of J.G. Wentworth's trademarks as meta tags, Peachtree seeks to ensure that a link to its websites is displayed near the link to J.G. Wentworth's website if a search engine user searches for "J.G. Wentworth."  By participating in AdWords and similar programs, Peachtree secures the right to have an advertisement and link to its website displayed in immediate proximity to a link to J.G. Wentworth's website by purchasing the use of J.G. Wentworth's famous "J.G. Wentworth" trademarks.  Whenever an Internet searcher on Google

---

[2] "Meta tags" are a part of the HTML source code which contains keywords that are used to describe the contents of a web page.  There are three kinds of meta tags: descriptive meta tags, keywords and robot tags, all of which are selected and controlled by the author or owner of the website.  Descriptive meta tags describe the content of the document.  Keyword meta tags are used by Internet search engines to help determine whether a particular website page is relevant to a search term that has been entered by a search engine user.  Robot meta tags indicate to search engines that certain website pages are not to be indexed by the search engine, and should therefore not be retrievable in search engine results.  (Amended Complaint ¶ 20)

enters one of J.G. Wentworth's famous "J.G. Wentworth" marks, perhaps as a result of interest piqued by J.G. Wentworth's extensive television advertising, Peachtree's use of J.G. Wentworth's marks ensures that an advertisement and link to its website will be displayed in immediate proximity to the link to J.G. Wentworth's website – the finding of which was the original goal of the searcher.  Peachtree participates in the AdWords program, and uses J.G. Wentworth's marks, in order to trade on J.G. Wentworth's goodwill, to cause consumer confusion and to divert users away from J.G. Wentworth's website to Peachtree's website.  (*Id.* ¶ 2)

There is nothing subtle about Peachtree's infringement.  There is no legitimate reason for Peachtree to use to use J.G. Wentworth's marks in the coding for *its own* websites, nor to use J.G. Wentworth's marks to ensure that an advertisement for its services and a link to its website appears near the link to J.G. Wentworth's website in response to a search *for J.G. Wentworth* other than to divert for itself consumers who are interested in *and actively seeking out* J.G. Wentworth.  (*Id.* ¶ 3)

Indeed, there can be little doubt that Peachtree's effort to divert traffic away from J.G. Wentworth's website to its own website is succeeding, to J.G. Wentworth's detriment. Google's own materials about its AdWords program state that the displayed position of the ad and website link of a program participant, such as Peachtree, depends both on the amount that the participant is willing to pay to use its competitor's trademarks and on how many Internet users actually "clickthrough" to the website link of the participant.  So the fact that Peachtree's link appears immediately alongside J.G. Wentworth's link shows both that Peachtree is willing to pay a relatively high price to usurp J.G. Wentworth's goodwill, and that it is successful in

doing so because it presumably must have a relatively high "clickthrough" rate to remain in a top spot.  (*Id.* ¶ 5)

J.G. Wentworth's websites are a critical part of its marketing of its services.  The harm to J.G. Wentworth's goodwill through Peachtree's infringement is thus extensive and irreparable.  (*Id.* ¶ 6)

## ARGUMENT

## I.  THE AMENDED COMPLAINT STATES VALID CLAIMS FOR RELIEF, AND SHOULD NOT BE DISMISSED.

The only issue to be decided by this Court on Peachtree's motion to dismiss is whether or not Peachtree's use of J.G. Wentworth's federally registered trademarks as keywords in search engine advertising programs and in the meta tags for its own websites constitutes trademark "use" of J.G. Wentworth's marks within the meaning of the Lanham Act as a matter of law.  (Def. Mem. at 2)  If, as J.G. Wentworth respectfully submits, the settled case law establishes that Peachtree's infringing use does constitute trademark "use," then Peachtree's motion should be denied in its entirety, and this action should proceed.

### A.  Peachtree's Motion to Dismiss Must Meet a High Procedural Standard.

"In reviewing a motion to dismiss a complaint or counterclaim pursuant to Rule 12(b)(6), the Court must 'accept as true the facts alleged in the complaint and reasonable inferences drawn from them.  Dismissal . . . is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved.'"  *McGraw-Hill Cos. v. Estate of Dailey*, 1998 U.S. Dist. LEXIS 6779, *4 (E.D. Pa. May 12, 1998) (quoting *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990)); *see also Wilkins v. ABF Freight Systems, Inc.*, 2005 WL 2271866, *3 (E.D. Pa., Sept. 15, 2005); *Naeem v. Bensalem Township*, 2005 WL 696763, *1 (E.D. Pa., Mar. 24, 2005); *Montgomery v. Beneficial Consumer Discount*

*Co.*, 2005 WL 497776, *3 (E.D. Pa., Mar. 2, 2005). "Not surprisingly, the moving party has the burden of persuasion under this standard." *Bell Helicopter Textron Inc. v. Tridair Helicopters, Inc.*, 982 F. Supp. 318, 320 (D. Del. 1997).

### B. Peachtree's Use of J.G. Wentworth's Trademarks in Keyword Advertising is Actionable.

Relying on cases that do not address the specific issue in this case – whether an infringer's use of another's trademark as a keyword in Internet search engine advertising is actionable – Peachtree argues that J.G. Wentworth's claims should be dismissed because Peachtree's infringing use does not constitute a "use" in commerce under the Lanham Act. Of the five cases of which J.G. Wentworth is aware that address the specific issue in this case, *all* but one reject Peachtree's argument, and hold or suggest that J.G. Wentworth's Amended Complaint states proper claims for relief.

*Government Employees Insurance Co. v. Google Inc.*, 330 F. Supp.2d 700 (E.D. Va. 2004) is apparently the first case to address the issue. In *Government Employees*, GEICO sued Google (and another search engine provider) because Google permitted GEICO's competitors to bid on GEICO's registered trademarks as keywords in Google's AdWords advertising program. *Id.* at 1213. Google moved to dismiss, arguing "that the complaint fails to allege facts supporting a claim that defendants use the marks 'in commerce' and 'in connection with the sale, offering for sale, distribution, or advertising of goods and services' (hereinafter 'trademark use'), because the complaint does not allege that defendants used plaintiff's trademarks in a way that identifies the user as the source of a product or indicates endorsement

of the mark owner." *Id.* at 1214.[3]  Even though Google was not a competitor of GEICO and its

conduct was one step removed from that of Peachtree here (*i.e.*, Peachtree does compete with

J.G. Wentworth and actually pays to use J.G. Wentworth's marks through its participation in the

AdWords program), the court rejected Google's arguments, and held that GEICO stated claims

for relief.  Specifically, the court held that:

> Plaintiff has sufficiently alleged that defendants used plaintiff's protected marks
> in commerce. . . . '[W]here keyword placement of advertising is being sold, the
> portals and search engines are taking advantage of the drawing power and
> goodwill of these famous marks.  The question is whether this activity is fair
> competition or whether it is a form of unfair free riding on the fame of well-
> known marks.'  J. Thomas McCarthy, *McCarthy on Trademarks & Unfair
> Competition* § 25:70.1 (2004).  Whether defendants' uses are legitimate fair uses
> of the trademarks in competition, and whether they create a likelihood of
> confusion, are fact-specific issues not properly resolved through a motion to
> dismiss.  *Id.* at 1215.[4]

The same issue – whether the unauthorized use of federally registered trademarks

in a search engine keyword advertising program stated a claim under the Lanham Act – was at

issue in *Google Inc. v. American Blind & Wallpaper Factory*, 2005 WL 832398 (N.D. Cal. Mar.

30, 2005).  As in the *GEICO* case, the defendants in *American Blind* argued that "American

Blind has not alleged—and cannot allege—that [the defendant search engine providers] have

---

[3] Google and its co-defendant also argued "that because they only use the trademarks in
their internal computer algorithms to determine which advertisements to show, this use of the
trademarks never appears to the user."  *Id.*

[4] The court subsequently found that GEICO had not met its burden of proving confusion
as a matter of fact, and granted summary judgment on this aspect of GEICO's claim.
*Government Employees Insurance Corp. v. Google, Inc.*, 2005 WL 1903128, *7 (E.D. Va. Aug.
8, 2005) ("the Court finds that plaintiff has failed to establish a likelihood of confusion stemming
from Google's use of GEICO's trademark as a keyword and has not produced sufficient evidence
to proceed on the question of whether the Sponsored Links that do not reference GEICO's marks
in their headings or text create a sufficient likelihood of confusion to violate either the Lanham
Act or Virginia common law"; "the Court emphasizes that its ruling applies only to the specific
facts of this case. . ."].  That ruling, based on the later-developed factual record, does not

used the American Blind Marks in a manner that is cognizable under the trademark laws." *Id.* at

*4. Again as in the *GEICO* case, the court denied the defendants' motion to dismiss, noting that

its order should be understood "as allowing American Blind's counterclaims and third-party

claims to proceed beyond the motion-to-dismiss stage, which will enable the Court to consider

both the relevant facts and the applicable law in the context of a fuller record." *Id.* at *7.

        The Tenth Circuit recently upheld the plaintiff's Lanham Act claims based on the

defendants' use of the plaintiff's registered trademarks on its website (during the time when it

sold the plaintiff's products as an unauthorized distributor), in the meta tags for the defendant's

website, and as keywords to obtain preferential treatment in the display of search results when

the plaintiff's marks were used as the search terms. *Australian Gold, Inc. v. Hatfield*, 436 F.3d

1228, (10th Cir. 2006). The defendants continued to use the plaintiff's trademarks in its meta

tags and as search engine keywords – the same two unauthorized uses at issue here – even after

they discontinued the sale of the plaintiff's products and removed explicit references to the

plaintiff's marks from their website. *Id.* at 1233. The Tenth Circuit noted that "[i]n this case, we

recognize another variant of potential confusion: 'initial interest confusion.'" *Id.* at 1230. The

Court explained that "[i]nitial interest confusion in the internet context derives from the

unauthorized use of trademarks to divert internet traffic, thereby capitalizing on a trademark

holder's goodwill." *Id.* at 1239. The Court then held that the "Defendants continued to use the

trademarks to divert internet traffic to their Web sites even when they were not selling Products.

Thus, Defendants used the goodwill associated with Plaintiffs' trademarks in such a way that

---

undermine or otherwise affect the court's ruling that GEICO stated a claim under the Lanham

Act.

consumers might be lured to the lotions from Plaintiffs' competitors. This is a violation of the Lanham Act." *Id.*

In another recent case, *Edina Realty, Inc. v. Themlsonline.com*, 2006 WL 737064 (D. Minn. Mar. 20, 2006), the Court squarely considered – and rejected – the argument that Peachtree advances here. As here, the defendant in *Edina Realty* participated in search engine keyword advertising programs by bidding on the plaintiff's trademarks to ensure that a link to its website appeared near the link to the plaintiff's website. Also as here, the defendant in *Edina Realty* at first used the plaintiff's marks in its own advertising, and then discontinued that explicit use, but still continued to participate in the keyword advertising programs and to bid on the use of the plaintiff's marks. Again as here, the defendant in *Edina Realty* argued that its infringing use did not constitute a use in commerce. The court flatly rejected that argument, holding:

> While not a conventional 'use in commerce,' defendant nevertheless used the Edina Realty mark commercially. Defendant purchases search terms that include the Edina Realty mark to generate its sponsored link advertisement. *See Brookfield Communs., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1064 (9th Cir. 1999) (finding Internet metatags to be a use in commerce). Based on the plain meaning of the Lanham Act, the purchase of search terms is a use in commerce. *Id.* at *3.

The only other case of which J.G. Wentworth is aware that deals with keyword advertising in anything like the context present here is *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 2006 WL 800756 (S.D.N.Y. Mar. 30, 2006), and this case is distinguishable from the facts here. While the court in *Merck* did hold that the use of competitor's mark in a keyword advertising is not a use in commerce, in reaching that conclusion, the court specifically noted that "it is significant that defendants actually sell Zocor (manufactured by Merck's Canadian affiliates) on their websites. *Under these circumstances*, there is nothing improper with defendants' purchase of sponsored links to their websites from searches of the keyword

'Zorcor.'"  *Id.* at *9 (emphasis added).  Here, by contrast, Peachtree does not sell J.G. Wentworth's services on its website; it uses J.G. Wentworth's registered trademarks in its keyword advertising program *only* to trade on J.G. Wentworth's goodwill.

Peachtree ignores the *Australian Gold* case, and seeks to minimize the relevance of the *Government Employees, American Blind and Edina Realty* cases.  In fact, each of these cases is directly on point, and squarely holds that a cause of action alleging trademark infringement *via* an Internet search engine keyword advertising program states a valid claim for relief.[5]  Peachtree's argument otherwise has no merit.

### C. Peachtree's Use of J.G. Wentworth's Trademarks in the Meta Tags for Peachtree's Own Websites is Actionable.

Despite Peachtree's contrary urging, courts since at least 1999 have found conduct like Peachtree's actionable.  "The first court to address initial interest confusion on the Internet found that the defendant had infringed the plaintiff's trademark by using marks confusingly similar to plaintiff's in its metatags.  *See Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999)."  *Savin Corp. v. The Savin Group*, 2003 WL 22451731, *12 (S.D.N.Y. Oct. 24, 2003), *aff'd and rev'd in part on other grounds*, 391 F.3d 439 (2d Cir. 2004), *cert. denied*, 126 S.Ct. 116 (2005).  "In *Brookfield*, the court ordered the

---

[5]  Peachtree argues that its infringing uses of J.G. Wentworth's marks cannot be trademark "use" because Peachtree's advertisement supposedly does not reference J.G. Wentworth's marks or use them to identify Peachtree's services.  (*See, e.g.*, Def. Mem. at 8-9)  Not only has that contention been rejected by the cases cited above, but Peachtree ignores J.G. Wentworth's claims under 15 U.S.C. § 1143(a).  That provision makes it actionable to use another's mark in a way that "is likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1143(a).  Peachtree's manipulations, which cause its ad and a link to its website to be displayed in search engine results in confusing proximity to J.G. Wentworth's link and trademarks, creates just such confusion or mistake about the origin, sponsorship and approval by J.G. Wentworth of Peachtree's services.

district court to enjoin the defendant's use of the mark MOVIE-BUFF, which was similar to plaintiff's MOVIEBUFF mark, in its metatags because such use would result in initial interest confusion amongst consumers.  The court found that this confusion existed 'even where people realize, immediately upon accessing "movie-buff.com", that they have reached a site operated' by defendant and not plaintiff.  *Id.* at 1057.  This is because the defendant 'will still have gained a customer by appropriating the goodwill' that plaintiff has developed in the mark.  *Id.*"  *Bayer Corp. v. Custom School Frames, LLC*, 259 F. Supp.2d 503, 509 (E.D. La. 2003).

The Third Circuit, although it has not addressed the issue in the context of infringing use of meta tags, has expressly held that "initial interest confusion is actionable under the Lanham Act."  *Checkpoint Systems, Inc. v. Check Point Software Technologies*, 269 F.3d 270, 292 (3d Cir. 2001).  In reaching its conclusion approving initial interest confusion as a basis for a trademark infringement claim, the Third Circuit surveyed other appellate decisions that had addressed the issue, and included a lengthy, approving discussion of the Ninth Circuit's seminal *Brookfield* decision.  *Id.* at 293-294.  Following that analysis, the Third Circuit held:

> We join these circuits in holding that initial interest confusion is probative of a Lanham Act violation.  Without initial interest protection, an infringer could use an established mark to create confusion as to a product's source thereby receiving a 'free ride on the goodwill' of the established mark. . . . Confining actionable confusion under the Lanham Act to confusion present at the time of purchase would undervalue the importance of a  company's goodwill.

*Id.* at 294-95.  After the Third Circuit's *Checkpoint* decision, at least one court in this District has held that "[u]nder certain circumstances, initial interest confusion can be created by the misleading use of metatags."  *Bijur Lubricating Corp. v. Devco Corp.*, 332 F. Supp.2d 722, 731 (D.N.J. 2004) (citing *Brookfield*).

Many other appellate and district court cases are in accord.  *See, e.g.*:

- *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, (10th Cir. 2006) (*see* p. 10 above);

- *Horphag Research Ltd. v. Pellegrini*, 329 F.3d 1108, 1112 (9th Cir. 2003) ("Because Garcia admits to using Horphag's Pycnogenol trademark and specifically admits to using the Pycnogenol mark in the meta-tags for his websites, his use satisfies the terms of trademark infringement in the first instance");

- *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002) ("by Equitrac's placing the term Copitrack in its metatag, consumers are diverted to its website and Equitrac reaps the goodwill Promatek developed in the Copitrak mark. . . . That consumers are mislead only briefly is of little or no consequence. . . . What is important is not the duration of the confusion, it is the misappropriation of Promatek's goodwill.  Equitrac cannot unring the bell");

- *Tdata Inc. v. Aircraft Technical Publishers*, 411 F. Supp.2d 901, 907 (S.D. Ohio 2006) ("Tdata's use of ATP's mark—use resulting from the affirmative act of including the mark as a metatag—can only serve to bring to Tdata's website potential customers, some of whom might never have gone there but for use of ATP's mark.  The Court thus agrees with ATP that use of the company's mark in metatags constitutes infringing use of the mark to pull consumers to Tdata's website and the products it features, even if the consumers later realize the confusion");

- *Full-House Productions, Inc. v. Showcase Productions, Inc.*, 2005 WL 3237729, *2 (N.D. Ill. Nov. 30, 2005) ("It is settled law in this circuit that placement of a

competitor's trademark in the metatags of one's website can be actionable under the Lanham Act because it causes 'initial interest confusion'");

- *Bayer Healthcare LLC v. Nagrom, Inc.*, 2004 WL 2216491, *6 (D. Kan. Sept. 7, 2004) ("the use of the mark ADVANTAGE in the metatags for the *tjspetshop.com*, *4fleacontrol.com*, and *fleadrops.com* web sites also constitutes an appropriation of goodwill and creates initial interest confusion");

- *Bayer Corp. v. Custom School Frames, LLC*, 259 F. Supp.2d 503, 509 (E.D. La. 2003) ("Here, the use of the mark ADVANTAGE in the metatags for the *no-fleas.com* web site also constitutes an appropriation of goodwill and creates initial interest confusion");

- *Flow Control Industries, Inc. v. Amhi, Inc.*, 278 F. Supp.2d 1193, 1199 (W.D. Wash. 2003) ("the Ninth Circuit has already determined that . . . metatagging a website with a competitor's mark creates 'initial interest confusion' in violation of the Lanham Act").[6]

Peachtree does not address these and like cases because it cannot. Courts uniformly hold that use of a competitor's trademark in meta tags states a claim for relief under the Lanham Act. Peachtree included J.G. Wentworth's marks in its meta tags apparently for at least several years; it should now be held to account for that conduct.

---

[6] Other than the *Merck* case discussed in the preceding section of this Memorandum, J.G. Wentworth is not aware of – and Peachtree has not cited any – case that dismissed a trademark claim under Fed. R. Civ. P. 12(b)(6) that alleged infringement through the misleading use of meta tags in the infringer's website. And as noted above, *Merck* is readily distinguishable because the defendants there sold the plaintiff's goods and so had a legitimate reason to be using the plaintiff's trademark.

**D. The Case Law and Factual Arguments on Which Peachtree Rely Are Distinguishable.**

      1.  <u>The case law on which Peachtree relies is distinguishable.</u>

      The cases on which Peachtree relies in its Memorandum are distinguishable. First, with the single exception of the *Merck* case discussed (and distinguished above), *none* of the other cases on which Peachtree relies dismissed a claim at the pleading stage under Fed. R. Civ. P. 12(b)(6) based on allegations similar to those made by J.G. Wentworth here. Instead, nearly all of the cases involved some consideration of the particular factual records at issue in those cases following, for example, motions for preliminary injunctions or summary judgment, or full-blown bench trials.[7]  So these cases involved failures of proof, and not a rejection by the courts of the legal theories at issue in them (or at issue in this case).  J.G. Wentworth, of course, has not yet had the opportunity to pursue discovery, or to present its proof to the Court.

      Second, Peachtree's heavy reliance on the on the "800" telephone number cases, *DaimlerChrysler AG v. Bloom*, 315 F.3d 932 (8th Cir. 2003), *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619 (6th Cir. 1996), and on the Internet "pop up" advertising cases, *1-800 Contacts, Inc. v. Whenu.com, Inc.*, 414 F.3d 400 (2d Cir. 2005), *Playboy Enterprises, Inc. v.*

---

[7]  *1-800 Contacts, Inc. v. Whenu.com, Inc.*, 414 F.3d 400 (2d Cir. 2005) (preliminary injunction); *Wells Fargo & Co. v. Whenu.com, Inc.*, 293 F. Supp.2d 734 (E.D. Mich. 2003) (same); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J.), *aff'd*, 159 F.3d 1351 (1998) (same); *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004) (summary judgment); *Interactive Products Corp. v. A2Z Mobile Office Enterprise*, 326 F.3d 687 (6th Cir. 2003) (same); *DaimlerChrysler AG v. Bloom*, 315 F.3d 932 (8th Cir. 2003) (same); *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619 (6th Cir. 1996) (same); *Scott Fetzer Co. v. Gehring*, 288 F. Supp. 696 (E.D. Pa. 2003) (same); *U-Haul International, Inc. v. Whenu.com, Inc.*, 279 F. Supp.2d 723 (E.D. Va. 2003) (same); *World Wrestling Federation Entertainment, Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp.2d 413 (W.D. Pa. 2003) (same); *Loockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949 (C.D. Cal. 1997) (same); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir. 2000) (bench trial); *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432 (3d Cir. 2000) (same).

*Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004), *Wells Fargo & Co. v. Whenu.com, Inc.*, 293 F. Supp.2d 734 (E.D. Mich. 2003) and *U-Haul International, Inc. v. Whenu.com, Inc.*, 279 F. Supp.2d 723 (E.D. Va. 2003) is misplaced.

   For example, in the "800" telephone advertising cases, the defendants procured telephone numbers "one possible alphanumeric translation of which" could be either "1-800-MERCEDES," and "1-800-H0[zero]LIDAY" (rather than "1-800-HOLIDAY") respectively. *DaimlerChrysler*, 315 F.3d at 934, *Holiday Inns*, 86 F.3d at 620.  In both of these cases, the defendants merely licensed to others the telephone numbers 1-800-637-2333 (in *DaimlerChrysler*) and 1-800-405-4329 (in *Holiday Inns*), and did not in any way use the marks at issue.  *DaimlerChrysler*, 315 F.3d at 936 ("[t]here is no dispute that [the defendant] only licensed the phone number but did not advertise or promote Mercedes' protected marks"); *Holiday Inns*, 86 F.3d at 623-24 (the district court "found that [the defendant] never used "1-800-HOLIDAY" or any of Holiday Inns's marks, and 'never advertised or publicized anything to do with Holiday Inns or its telephone number'").  In these circumstances, the Court in *DaimlerChrysler* held "that the licensing of a toll-free telephone number, without more, is not a 'use' within the meaning of the Lanham Act, even where one possible alphanumeric translation of such number might spell-out a protected mark."  315 F.3d at 938.  The Court in *Holiday Inns* reached the same conclusion.  86 F.3d at 625.  The facts here – where Peachtree uses J.G. Wentworth's marks in its meta tags, as keywords for advertising, and in the display of search results by causing a link to its website to appear confusingly near link to J.G. Wentworth's website containing J.G. Wentworth's marks – are obviously very different from those in *DaimlerChrysler Holiday Inns*.

The "pop up" advertising cases on which Peachtree heavily relies are similarly inapposite. As explained by the Second Circuit, for example:

> WhenU {the defendant} provides a proprietary software called 'Save Now' without charge to individual C-users {computer users}, usually as part of a bundle of software that the C-user voluntarily downloads from the internet. 'Once installed, the SaveNow software requires no action by the [C-user] to activate its operations; instead, the SaveNow software responds to a [C-user]'s "in-the-moment" activities by generating pop-up advertisement windows' that are relevant to those specific activities. To deliver contextually relevant advertising to C-users, the SaveNow software employs an internal directory comprising 'approximately 32,000 [website addresses] and [address] fragments, 29,000 search terms and 1,200 keyword algorithms" that correlate with particular consumer interests to screen the words a C-user types into a web browser or search engine or that appear within the internet sites a C-user visits.

*1-800-Contacts*, 414 F.3d at 404 (citations omitted).[8] In reaching its conclusion that WhenU's inclusion of 1-800-Contacts' Internet website address in its keyword database does not constitute a trademark "use," the Second Circuit noted that the use of the website address rather than the mark is a critical distinction because the website address "transform[s] 1-800's trademark – which is entitled to protection under the Lanham Act – into a word combination that functions more or less like a public key to 1-800's website." *Id.* at 408-09. The Court further observed that "it is plain that WhenU is using 1-800's website address precisely because it is a website address, rather than because it bears any resemblance to 1-800's trademark." *Id.* at 409. And unlike here where Peachtree uses J.G. Wentworth's actual trademarks, the Court found that:

> a WhenU pop-up ad cannot be triggered by a C-user's input of the 1-800 trademark or the appearance of that trademark on a webpage accessed by the c-user. Rather, in order for WhenU to capitalize on the fame and recognition of 1-

---

[8] Three of the "pop up" advertising cases cited by Peachtree involve the same defendant, WhenU, and the same basic software scheme. *See 1-800-Contacts*, *Wells Fargo*, and *U-Haul International*. A fourth "pop up" advertising case cited by Peachtree, *Playboy Enterprises*, involved a different defendant and somewhat different facts. The Court in *Playboy Enterprises* also reached a different conclusion, finding that the "pop up" advertising scheme there did constitute a "use" of the plaintiff's trademarks. 354 F.3d at 1031, 1033.

> 800's trademark – the improper motivation both 1-800 and the district court ascribe to WhenU – it would have needed to put the actual trademark on the list.

*Id.* The Court followed this "observation" by noting that it is "not intended to suggest that inclusion of a trademark in the directory would necessarily be an infringing 'use.' *We express no view on this distinct issue.*" *Id.* at 409 n. 11 (emphasis added). In other words, the Second Circuit found that the "pop-up" advertising cases do not involve the same issue as present here, and that these cases do not address the "distinct" issue here.

### 2. Peachtree's factual arguments are distinguishable.

Peachtree argues that its "actions are no more an infringing use of a trademark than a manufacturer's contract with a store owner to place its generic drug on the shelf next to the corresponding name-brand drug," or that its "'use' of the Wentworth marks to trigger a link to its own website provides consumers the option of investigating the competitive alternative that Peachtree offers." (Def. Mem. at 2)[9] These and the similar arguments that Peachtree advances ignore the deceptiveness of its actions and the consequent confusion that its conduct causes consumers. Peachtree's conduct is not like paying for open and obvious product placement on store shelves; it is much more like Peachtree having paid the telephone company to place its telephone number alongside J.G. Wentworth's yellow pages listing without obvious

---

[9] Peachtree also argues: (1) that its conduct "is akin to a manufacturer's contracting with a drugstore to place its generic acetaminophen next to Tylenol, or to a fast-food chain's instruction to its franchisees to open restaurants adjacent to the locations of its more famous competitor" (Def. Mem. at 9); and (2) that its "alleged actions do not increase consumer search costs or incorrectly suggest the origin of its services. To the contrary, Peachtree's contextual advertising truthfully identifies a competing product. Its advertisement may attract customers who originally sought Plaintiff's website, but only by providing an alternative, accurately labeled choice. And that is no more unlawful than the placement of competing products close to a well-known brand on store shelves in the hope that consumers originally intending to buy brand-name goods will buy the competitive goods instead" (*id.* at 16).

differentiation so that a caller seeking J.G. Wentworth's telephone number finds Peachtree's number and calls Peachtree instead of J.G. Wentworth.

So unlike the "bricks and mortar" store examples that Peachtree gives – where the product placement is readily and unambiguously apparent to consumers – Peachtree's conduct is neither transparent nor honest.  So that conduct results in the display of search results with the advertisement and link for Peachtree's website in close and confusing proximity to the display of the link for J.G. Wentworth's website which contains the J.G. Wentworth marks.  (*See* Amended Complaint ¶¶ 2, 27, 34, 41, 46 (alleging confusion resulting from Peachtree's conduct))

Contrary to the allegations in the Amended Complaint, Peachtree wrongly assumes that because its infringing ad and website link "appears under the heading 'Sponsored Links,' either in a box at the top of the search-results page of along its right-hand margin," this display is not likely to cause confusion as a matter of law.  (Def. Mem. at 9 fn. 7)  Not only does a cursory review of the actual search engine results pages attached to the Amended Complaint as Exhibits 2-4 negate that contention, but the available academic literature does so as well.  For example, according to one recent paper:

> Empirical studies have shown that the 'typical' Web searcher has little understanding of how search engines retrieve, rank or prioritize links on the results page.  Using results from a user study, Marable reports searchers trust search engines to present only unbiased results on the first page, not realizing that 41% of selections were sponsored listings.
>
> . . .
>
> Hotchkiss, Garrison and Jensen conducted a survey study with 425 respondents. The researchers report there is confusion concerning sponsored links, with more than 30% of participants unable to identify properly the sponsored links on a [search engine results page]. . . . In a follow-on study, Hotchkiss found that novice users have particular trouble determining sponsored links, and the researcher reports that half of participants were suspicious that payments influence even the organic links.

. . .

The Pew Internet and American Life Project reports results of a survey on how users interact with Web search engines. The results reported indicate that searchers trust search engines (or at least the one or two they use), but they do not understand how these search engines rank and present links. Only 38 percent of searchers reported awareness of the distinction between sponsored results and organic links. Less than 17 percent report that they can always tell which results are sponsored and which are organic.[10]

Peachtree's actions are far more disingenuous than the innocuous paid placement of one product next to another on the shelves of an actual merchant. Consumers can readily discern that the products are different and that there is no sponsorship or affiliation between the competing brands. That distinction, so easily made in the physical world, is much more difficult to make on the Internet – especially when the results are manipulated by unfair competitive conduct.

**E. Since Peachtree's Actions Constitute "Use" of J.G. Wentworth's Trademarks, Peachtree's Motion to Dismiss J.G. Wentworth's Remaining Claims Should Be Denied.**

Peachtree argues that J.G. Wentworth's remaining seven non-trademark claims for relief "all share with Plaintiff's federal trademark infringement claim the same threshold requirement of trademark 'use.'" (Def. Mem. at 19-21) Even if Peachtree were correct (and J.G. Wentworth does not concede that), the point is moot. As shown above, Peachtree's use of J.G. Wentworth's marks in the meta tags for its own website and as keywords in Google's and other search engine's advertising programs does meet the "threshold requirement of trademark 'use.'" And since that was the *only* ground on which Peachtree sought to dismiss these claims, its motion to dismiss these claims must be denied as well.

---

[10] *See* Jansen, B.J. & Resnick, M., *Examining Searcher Perceptions of and Interactions with Sponsored Results* at 2-3 (2005) (footnotes omitted), available at http://www.ist.psu.edu/faculty_pages/jjansen/academic/pubs/jansen_ecommerce_workshop.pdf.

**CONCLUSION**

For all the foregoing reasons, J.G. Wentworth respectfully submits that Peachtree's motion to dismiss should be denied in its entirety, and that the Court should grant such further relief as it deems just and proper.

Dated: May 18, 2006
      New York, New York

ABELMAN, FRAYNE & SCHWAB

_____

Jeffrey A. Schwab
Richard L. Crisona
666 Third Avenue
New York, New York 10017
(212) 949-9022

OCHROCH & GRABER, P.C.
Richard M. Ochroch
James J. Waldenberger
318 S. Sixteenth Street
Philadelphia, PA 19102
(215) 735-2707

Attorneys for Plaintiff J.G. Wentworth S.S.C.
Limited Partnership

## CERTIFICATE OF SERVICE

It is hereby certified that on May 18, 2006, a copy of the foregoing Memorandum of J.G. Wentworth S.S.C. Limited Partnership in Opposition to Motion to Dismiss was filed electronically and is available for viewing and downloading from the ECF system. It is further certified that on this date the foregoing Memorandum of J.G. Wentworth S.S.C. Limited Partnership in Opposition to Motion to Dismiss was served by email on:

Samir C. Jain
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M. Street, N.W.
Washington, D.C. 20037
samir.jain@wilmerhale.com

Attorney for Defendant Settlement Funding LLC
d/b/a Peach Settlement Funding


Richard L. Crisona

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

J.G. WENTWORTH S.S.C. LIMITED
PARTNERSHIP,

*Plaintiff*,

-against-                                           06-CV-00597-TON

SETTLEMENT FUNDING, LLC d/b/a
PEACHTREE SETTLEMENT FUNDING,

*Defendant.*

## <u>ORDER</u>

AND NOW, this ___ day of _____, 2006, upon consideration of defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), and plaintiff's opposition thereto, it is hereby ORDERED that plaintiffs' motion is **DENIED**.

BY THE COURT:

_____
United States District Judge