IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| J.G. Wentworth, S.S.C. Limited Partnership,<br><br>*Plaintiff,*<br><br>v.<br><br>Settlement Funding LLC d/b/a<br>Peachtree Settlement Funding,<br><br>*Defendant.* | Civil Action No. 06-0597 (TON) |

**REPLY TO PLAINTIFF'S MEMORANDUM
IN OPPOSITION TO MOTION TO DISMISS**

Plaintiff's Opposition to Peachtree's motion to dismiss does nothing to overcome the fundamental shortcoming of its Amended Complaint: it does not (and cannot) allege that Peachtree in fact "used" Plaintiff's marks to identify Peachtree's goods or services to consumers—an essential prerequisite for a claim under the Lanham Act. Indeed, by Plaintiff's own admission, all the alleged conduct that forms the basis for its complaint—Peachtree's purchase of keyword advertising and its inclusion of Plaintiff's marks in certain "metatags" in the source code of two websites—was entirely *invisible* to consumers. The only visible trademarks in either Peachtree's advertisements or its websites were those belonging to Peachtree itself. In short, Plaintiff's Amended Complaint does not allege a source-identifying, trademark "use" of its marks and therefore fails at the threshold.

Rather than confront this failing, the bulk of Plaintiff's Opposition is devoted to issues irrelevant to Peachtree's motion to dismiss. Plaintiff seeks to have the Court focus on what Plaintiff alleges was the "bad intent" behind Peachtree's conduct, arguing that Peachtree seeks to

"divert" consumers so that they use Peachtree's services instead of Wentworth's. But that has no bearing on this case. To begin with, all advertising has precisely that same goal. And more important, liability under the Lanham Act does not turn on intent: the question of Peachtree's motive has nothing to do with whether the Amended Complaint has alleged an actionable use of Plaintiff's marks. Plaintiff's extended discussion of cases relating to the issue of consumer confusion is similarly beside the point. Although likelihood of confusion is an element of a trademark infringement claim, Peachtree's motion concerns the *separate*—and preliminary—element of trademark "use." Thus, regardless of whether Plaintiff has sufficiently alleged a likelihood of confusion, the issue this Court must decide is whether Plaintiff has alleged an actionable trademark use.

When Plaintiff finally turns to this dispositive issue, it fails to grapple with the relevant cases. It seeks to dismiss the most developed, considered case law in this area, and instead suggests that the Court blindly follow the outcomes of cases that fail to analyze the issues raised in Peachtree's motion. Yet, as Peachtree explained in its opening memorandum and discusses further below, the correct application of the relevant law permits only one resolution: dismissal of all of Plaintiff's claims for failure to state a claim for unlawful "use" of Plaintiff's marks under the Lanham Act or its state law equivalents.

## ARGUMENT

I. **PEACHTREE'S PURCHASE OF KEYWORD ADVERTISING IS NOT A TRADEMARK USE OF PLAINTIFF'S MARKS.**

As Peachtree set forth at the very start of the briefing on its motion, "[t]here can be no liability under the Lanham Act absent the use of a trademark *in a way that identifies the products and services being advertised by the defendant.*" *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003) (emphasis added). In the most recent case applying this

2

principle in the specific context of keyword advertising—a case that could not be more on point—the Southern District of New York squarely held that when a party purchases a mark from a search engine as a keyword,

> the [plaintiff's] mark is 'used' only in the sense that a computer user's search of the [trademarked name] will trigger the display of sponsored links to defendants' websites. *This internal use of the mark . . . as a key word to trigger the display of sponsored links is not use of the mark in a trademark sense.*

*Merck & Co. v. Mediplan Health Consulting, Inc.*, Nos. 05 Civ. 3650 et al., 2006 WL 800756, at *9 (S.D.N.Y. Mar. 30, 2006), *recon. denied*, 2006 WL 1418616 (S.D.N.Y. May 24, 2006) (emphasis added). That holding is in full accord with the *WhenU* line of cases, all of which conclude that the use of a web address containing the plaintiff's mark as a trigger for the display of competing advertisements does not constitute an actionable trademark "use." *See 1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400 (2d Cir.), *cert. denied*, 126 S. Ct. 749 (2005); *Wells Fargo*, 293 F. Supp. 2d at 762; *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003).

Significantly, Plaintiff does *not* challenge the underlying principle of these cases: that mere "use" of a trademark in an invisible, behind-the-scenes sense is not, on its own, "trademark use" because it does not implicate the "source identification" function of trademark law. Instead, Plaintiff tries, but fails, to distinguish these cases on the facts. As to *Merck*, Plaintiff asserts that the decision turned on the fact that the defendants there sold the plaintiff's products. (Opp. at 11-12.). But Plaintiff simply misreads the case: as noted above, the court's core legal conclusion was that the purchase of keywords is "not use of the mark in the trademark sense." *Merck*, 2006 WL 800756, at *9. To be sure, after reaching that holding, the court noted that a *further* basis for dismissal was presented by the defendant's sale of plaintiff's products—a reference to the "nominative use" theory on which the court had relied in dismissing claims

3

against other defendants who similarly sold plaintiff's products. *Id.* at *8 (holding that defendant CrossBorder's use of Plaintiff's mark on its website was a "nominative fair use" of the mark because CrossBorder actually sold Merck products). But the court's primary ruling that keyword advertising is not a "use" of a trademark under the law was independent of, and in no way conditioned on, that alternate theory.

Similarly, Plaintiff offers no viable basis to distinguish the *WhenU* cases. It suggests that these cases differ because the WhenU database contained the Internet address of the plaintiff, which incorporated the plaintiff's mark (*e.g.*, "www.pepsi.com"), rather than just the trademark (*e.g.*, "Pepsi") in isolation. (Opp. at 18-19.) But two of the *WhenU* cases, *Wells Fargo* and *U-Haul*, do not even discuss this supposed distinction, let alone suggest that it was in any way relevant to their holdings, and Plaintiff does not quote or cite any language from those cases to suggest it was. Although the *1-800 Contacts* case does note the difference between marks and web addresses in its description of the WhenU database, its ruling in no way turns on the proposition that the "use" of the mark standing alone is somehow worse than the use of the mark in a web address. Indeed, the court's categorical ruling that the database presented no trademark "use" extends equally to marks in a web address or marks standing alone: A "company's internal utilization of a *trademark* in a way that does not communicate it to the public is analogous to a [sic] individual's private thoughts about a trademark. Such conduct simply does not violate the Lanham Act." 414 F.3d at 409 (emphasis added); *see also id.* at 410 (explaining that "[t]he fatal flaw" in plaintiff's claim was that the "ads do not display the 1-800 trademark"). Thus, as much as Plaintiff tries to suggest otherwise, the *WhenU* cases all compel the conclusion that "use" of a trademark to trigger the display of an advertisement does not constitute actionable use when the trademark is not displayed or utilized to identify the source of goods to a consumer.

By contrast, the cases to which Plaintiff points fail to support its position. Plaintiff most prominently relies on *GEICO v. Google, Inc.*, 330 F. Supp. 2d 700 (E.D. Va. 2004). (Opp. at 8-9.) Yet that case relied heavily on the *district court's* decision in *1-800 Contacts* and explicitly rejected the holdings in *U-Haul* and *Wells Fargo*. But the Second Circuit subsequently overturned the district court decision in 1-800 Contacts, describing the reasoning in *U-Haul* and *Wells Fargo* as "persuasive and compelling." 414 F.3d at 408. Moreover, as Peachtree previously explained, *GEICO* is plainly distinguishable on the facts. The alleged "uses" in that case, including specifically the use of the plaintiff's mark in the text of advertisements, do not exist here. (Peachtree Mem. at 13 n.10.) Plaintiff offers no response at all to these distinctions.

Plaintiff also accuses Peachtree of "ignor[ing]" a Tenth Circuit case involving an unauthorized reseller of tanning lotions whose seven "Web sites displayed pictures and descriptions of [Plaintiff's] Products and used Plaintiff's trademarks" without authorization. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1233 (10th Cir. 2006); (Opp. at 12). But that case is plainly distinguishable on the facts, because the defendants displayed the plaintiff's marks on their websites. Moreover, that case does not even purport to address the issue of trademark "use," presumably because the defendants' appeal was based on the claim that the plaintiff had failed to prove likelihood of confusion, which, as discussed below, is a wholly distinct element of an infringement claim. *See* 436 F.3d at 1238. Thus, *Australian Gold* is inapposite.[1]

---

[1] Of the other two "on point" cases Plaintiff discusses, one simply held (again, prior to the Second Circuit's decision in *1-800 Contacts*) that "the uncertain state of the law" could not justify dismissal on the pleadings alone. *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, No. C-03-05340-JF, 2005 U.S. Dist. LEXIS 6228, at *22 (N.D. Cal. Mar. 30, 2005). The other fails to analyze trademark use at all—finding only that the purchase of a mark was a "use in commerce," without addressing whether that was a trademark use to identify the source of goods and services. *Edina Realty, Inc. v. TheMLSonline.com*, No. Civ. 04-4371, 2006 WL 737064, at *3 (D. Minn. Mar. 20, 2006), *mot. to amend denied*, 2006 WL 1314303 (D. Minn. May 11, 2006); *see also* (Peachtree Mem. at 13 n.10).

5

Ultimately, the remaining arguments to which Plaintiff clings are two red herrings—arguments that are nothing more than a way of distracting from the basic threshold legal issue of trademark use. First, Plaintiff repeatedly impugns Peachtree's motives, suggesting that it is acting in an "insidious" manner by trying to "divert" customers to its website. (*See, e.g.*, Opp. at 2-4, 20-21.) But the threshold issue presented here—as in any Lanham Act claim—is not Peachtree's motive, but rather whether its actions constituted a trademark "use" of Plaintiff's marks. *See, e.g., Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 626 (6th Cir. 1996) (explaining that defendant's "intent" in choosing a phone number corresponding to "1- 800-H[zero]LIDAY" was irrelevant where the "prerequisite" of trademark use was not met). In other words, even if Peachtree had acted with "bad" motives, Plaintiff's claim still would have to be dismissed because Peachtree did not "use" its mark: even the worst of motives cannot "transmute a lawful act into an unlawful one." *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:110 (4th ed. 2005).

But in any event, Plaintiff's characterization of Peachtree's conduct as being somehow malevolent is off the mark. As the Amended Complaint makes clear, Peachtree did no more than present consumers with an alternative competitive choice through an advertisement that clearly and prominently identified Peachtree as the source of that alternative. (Am. Compl. ¶ 27 & Exhibit 2.) Although that advertisement might well attract customers who originally sought Plaintiff's website and thereby "divert" them, that does not itself make Peachtree's motives evil (or its actions unlawful).[2] Indeed, that is precisely the purpose of *all* advertising: to attract

---

[2]   *See* Stacey L. Dogan & Mark A. Lemley, *Trademarks and Consumer Search Costs on the Internet*, 41 Hous. L. Rev. 777, 820 (2004) ("[T]he fact that an advertiser uses a keyword to reach a consumer with accurate information that is of interest to that consumer cannot itself be 'confusion' . . . . It may be a diversion of consumer attention, but if the consumer is not confused, that diversion is simply not illegal.").

customers away from competitors' products and to one's own product. The only relevant question is whether Peachtree's actions were a form of legitimate competition or were a result of unlawful trademark infringement. Because Peachtree did not engage in a source-identifying use of Plaintiff's marks, it cannot be the latter—regardless of its motives or intent.

Second, Plaintiff repeatedly returns to its claim that Peachtree's conduct allegedly caused confusion or falls within the doctrine of "initial interest confusion." (*See, e.g.*, Opp. at 10, 12-15). But Plaintiff conflates two distinct issues: a Lanham Act claim requires proof of *both* use and likelihood of confusion—in that order—and Plaintiff cannot rely on claims concerning the latter to meet the former requirement. As the Second Circuit explained,

> [T]his rationale puts the cart before the horse. Not only are 'use,' 'in commerce,' and 'likelihood of confusion' three distinct elements of a trademark infringement claim, but 'use' must be decided as a threshold matter because, while any number of activities may be 'in commerce' or create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark.

*1-800 Contacts*, 414 F.3d at 412 (citing 15 U.S.C. § 1114 and *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001)). Nor can invocation of the "initial interest confusion" doctrine permit Plaintiff to escape the "use" element. Plaintiff points to the Third Circuit's purported adoption of this doctrine in *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.*, 269 F.3d 270 (3rd Cir. 2001), but that case reaffirms that a plaintiff must show that a defendant's "*use* of the mark *to identify* goods or services" was the cause of any confusion. *Id.* at 279 (emphasis added). Thus, Plaintiff's repeated references to "confusion" simply *sow* confusion and are wholly irrelevant to the threshold issue raised by Peachtree's motion.[3]

---

[3] Plaintiff's discussion of the "academic literature" on consumer confusion with respect to the "Sponsored Links" returned by Internet search engines is similarly premature. (Opp. at 20-21.) Even leaving aside that it is inappropriate to rely on "evidence" outside the four corners of the complaint on a motion to dismiss, the issue before the Court here is whether Peachtree

## II. PEACHTREE'S ALLEGED INCLUSION OF INVISIBLE METATAGS IS ALSO NOT AN ACTIONABLE "USE."

As Peachtree explained in its opening memorandum, its alleged "use" of the Wentworth name in the metatags of two of Peachtree's websites, just like its use of keyword advertising, is a purely "internal use of the mark" designed "to trigger the display of" a link to Peachtree's website. *Merck*, 2006 WL 800756, at *9. This "'pure machine-linking function,'" which Plaintiff concedes is "invisible" to consumers, is not a source-identifying "trademark use." *U-Haul*, 279 F. Supp. 2d at 728.

Plaintiff does not even grapple with this issue or show any logical or policy reason to find otherwise, or to differentiate metatags from keyword advertising in this respect. Instead, it invites the Court to mechanically find liability here because some other courts have found Lanham Act liability in cases involving metatags. (*See* Opp. at 13-15.) But to do so, the Court would have to blind itself to the analysis of the "trademark use" element, as explicated in the *WhenU* and *Merck* cases. In fact, the line of cases Plaintiff cites, many of which pre-date the *Merck* and *WhenU* decisions, have been the subject of increasing criticism precisely because they uniformly ignore the threshold question of trademark "use." (*See* Peachtree Mem. at 17-18.) Indeed, in most of these cases, the defendants appear not even to have raised that issue. As the quotations on which Plaintiff relies make clear, the metatags cases simply assume "use" without

---

"used" Plaintiff's marks in a source-identifying manner, not likelihood of confusion. In any event, the paper Plaintiff cites does not support its claim that consumers are confused concerning the progeny of "Sponsored Links" on their search result screens. Instead, the paper concludes that Internet users exhibit a strong preference for "organic" links and a bias against "sponsored" links in search results, which demonstrates that, contrary to Plaintiff's theory, Internet users can and do distinguish between advertisements such as Peachtree's "Sponsored Link," and actual search results. *See* B.J. Jansen & M. Resnick, *Examining Searcher Perceptions of an Interactions with Sponsored Results* (presented at Workshop on Sponsored Search Auctions, ACM Conference on Electronic Commerce, Vancouver, Canada, June 5, 2005), *available at* http://www.ist.psu.edu/faculty_pages/jjansen/academic/pubs/jansen_ecommerce_workshop.pdf.

8

analyzing the underlying issue, and typically skip directly to "initial interest *confusion*"[4/]—an issue which, as noted above, is a wholly distinct element of a trademark infringement claim and cannot be used to bootstrap a finding of trademark "use."

In short, the cases dealing with metatags have not considered a basic element of infringement that other courts, such as the Second Circuit, have explained is a prerequisite to determining Lanham Act liability. As such, those cases simply do not speak to or in any way analyze the specific question that is before this Court: whether the inclusion of a mark in metatags that are invisible to consumers is a source-identifying, trademark use. Thus, Plaintiff's suggestion that the Court simply follow those cases in deciding this motion is tantamount to a request that the Court abdicate its responsibilities to decide the legal question before it.

In any event, the metatags cases do not even *implicitly* suggest that the inclusion of a mark in metatags, standing alone, is an unlawful trademark use. That is because, in virtually all of the cases that Plaintiff cites, the defendants engaged in other "uses" of the plaintiffs' trademarks (in addition to inclusion as metatags) that could account for the courts' presumption of the requisite "trademark use." In a number of those cases, those additional uses actually involved displaying the mark to consumers in connection with the defendant's site, services, or goods—the archetypical "trademark use" not present here. *See, e.g., Australian Gold*, 436 F.3d at 1233 (marks displayed prominently on defendant's websites); *Tdata Inc. v. Aircraft Tech. Publishers*, 411 F. Supp. 2d 901, 904 n.4 (S.D. Ohio 2006) (marks used as part of "the title of

---

[4/]    *See, e.g., Full House Prods., Inc. v. Showcase Prods., Inc.*, No. 05 C 4602, 2005 U.S. Dist. LEXIS 30258, at **4-5 (N.D. Ill. Nov. 30, 2005) (beginning legal analysis with conclusion that "placement of a competitor's trademark in the metatags of one's website . . . causes 'initial interest confusion') (citing *Promatek Indus. Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812-13 (7th Cir. 2002); *Bayer Corp. v. Custom School Frames, LLC*, 259 F. Supp. 2d 503, 509 (E.D. La. 2003) (holding, with no mention of "use" issue, that "the use of the ADVANTAGE mark in the metatags for Defendants' website creates initial interest confusion").

[defendant's] web page in the [search-result] listings"); *Full House*, 2005 US Dist LEXIS 30258, at *6 (defendant registered and used domain name that included mark); *Bayer Healthcare LLC v. Nagrom, Inc.*, No. 03-2448-KHV, 2004 U.S. Dist. LEXIS 19454 (D. Kan. Sept. 4, 2004) (mark used as title of defendants webpages); *Savin Corp. v. Savin Group*, No. 02 Civ 9377, 2003 U.S. Dist. LEXIS 19220 (S.D.N.Y. Oct. 24, 2003) (defendant registered and used domain name that included mark), *aff'd in part and vacated in part*, 391 F.3d 439 (2d. Cir. 2004), *cert. denied*, 126 S. Ct. 116 (2005); *Bayer Corp. v. Custom School Frames, LLC*, 259 F. Supp. 2d 503 (E.D. La. 2003) (marks displayed prominently on defendant's websites); *Flow Control Indus. v. Amhi, Inc.*, 278 F. Supp. 2d 1193 (W.D. Wash. 2003) (defendant registered and used domain name that included mark).[5]

This Court should reject Plaintiff's call to reflexively follow this list of ultimately dissimilar cases, which shed no light on the issue posed by this motion. Instead, this Honorable Court should follow the lead of courts such as the Second Circuit and address directly the straight-forward question: Does the incorporation of a mark into metatags that are invisible to consumers constitute a "use" of that mark that identifies to consumers the source of goods and services, such that a Lanham Act claim may lie. As Peachtree has shown, in the circumstances as alleged in the Amended Complaint, the answer to that question is no.

Similar to keyword advertising, use of metatags merely leads some search engines to present a link to Peachtree's website clearly labeled with Peachtree's—and not Wentworth's—mark, below listings for Wentworth. The result is to present users with a competitive choice,

---

[5] The only two cases involving metatags that Plaintiff cites that did not involve such additional uses, *Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036 (9th Cir. 2003), and *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002), both did not discuss trademark "use" at all and instead focused on initial interest confusion, an approach that, as discussed above, inappropriately ignores the independent need to establish a trademark use.

akin to a generic drug manufacturer contracting with a store to place its generic drug on the shelf next to its brand name competitor. *See 1-800 Contacts*, 414 F.3d at 411. Plaintiff's attempt to dismiss this analogy by suggesting that, unlike in a store setting, Peachtree's conduct is somehow not "honest" and will cause "confusion" (Opp. at 19-21) is both inaccurate and, as described above with respect to keyword advertising, misses the point. It is inaccurate because, as the allegations in the Complaint make clear, Peachtree's advertisements and websites are clearly labeled with Peachtree's own marks, not those of Wentworth. And it is irrelevant because, again, the question before the court is not confusion, but whether Peachtree has engaged in a trademark use.[6]

---

[6] Indeed, Plaintiff's own analogy to paying a directory publisher to place its own phone listing alongside that of a competitor "without obvious differentiation" (Opp. at 19-20) illustrates Plaintiff's error. Even assuming that such an action caused callers to be confused, it is clear in that case that the purchaser of the listing is not in any sense "using" the competitor's trademark except as a basis to make its own purchasing decision. But that does not involve the "use" of a mark to identify the source of its goods to consumers. *Cf. Holiday Inns*, 86 F.3d at 626 (holding that defendant's registration and use of a vanity telephone number called almost exclusively by consumers who were intending to reach plaintiff was not a "use" of plaintiff's trademark).

## CONCLUSION

For the foregoing reasons and those provided in Peachtree's opening memorandum, Peachtree respectfully requests that this Honorable Court grant Peachtree's motion and dismiss Plaintiff's Amended Complaint with prejudice for failure to state a claim upon which relief can be granted.[2/]

Respectfully submitted,

Dated: May 26, 2006

_____
Peter F. Marvin
MARVIN & HENKIN
8327 Germantown Avenue
Philadelphia, Pa. 19118
(215) 248-5201 (phone)
215.248.5204 (facsimile)
Pmarvin@Marvinhenkin.com (email)
Attorney I.D. 16095

Lynn R. Charytan
Samir C. Jain
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
(202) 663-6000 (phone)

*Attorneys for Defendant
Settlement Funding LLC d/b/a
Peachtree Settlement Funding.*

---

[2/] As discussed in Peachtree's memorandum, because Plaintiff's claims for federal trademark infringement, federal false representation, and Pennsylvania common law trademark infringement all require a threshold showing of trademark use just like its infringement claim, its failure to show such use requires dismissal of all its claims. (Peachtree Mem. at 19-21.) Plaintiff does not even purport to offer any basis why these other claims should survive if the Court does not find the requisite "use." (*See* Opp. at 21.). Plaintiff does inexplicably suggest that "Peachtree ignores J.G. Wentworth's claims under 15 U.S.C § 1143(a)." (Opp. at 12 n.5.) But no such provision exists, nor does the Amended Complaint state such a claim. Plaintiff presumably means Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), otherwise known as a False Designation of Origin or False Representation claim—which Peachtree *did* explicitly address. (*See* Peachtree Mem. at 19-20.)

12

## Certificate of Service

It is hereby certified that on May 26, 2006 a copy of the foregoing Reply Brief was filed electronically and is available for viewing and downloading from the ECF system. It is further certified that on this date the foregoing Reply Brief was served by first class mail, postage prepaid on:

>Richard M. Ochroch, Esq.
>James J. Waldenberger, Esq.
>318 So. 16th Street
>Philadelphia, PA 19102
>
>*Attorneys for Plaintiff*
>*J.G. Wentworth, S.S.C.*
>*Limited Partnership*

_____
Peter F. Marvin